[Civ. No. 14424.   Second Dist., Div. One.   Aug. 25, 1944.]

Estate of MARY C. AGNEW, Deceased. SAMUEL E. NORRIS et al., Appellants, v. KATIE LARAIA, Respondent.

H. M. Lineman and Mab Copeland Lineman for Appellants.

C. M. Castruccio for Respondent.

YORK, P. J.—This is an appeal by Samuel E. Norris, as proponent and petitioner for letters testamentary, and by Edith M. Norris, his wife, as sole beneficiary under the will of Mary C. Agnew, deceased, from a judgment denying admission of said will to probate.

Appellants were not related to testatrix, but were friends of some years standing. Respondent, a resident of Massachusetts, is a cousin of decedent, with whom she kept in touch through correspondence.

Miss Agnew, the testatrix, had lived with her brother in a small rear dwelling at 1330½ South Myrtle Street, Los Angeles, for about fifteen years. When her brother died in 1936, appellants were adjacent neighbors but shortly thereafter they removed to another location, testatrix continuing to live by herself until June 5, 1941, when she was taken to the home of appellants under the following circumstances:

Often testatrix wrote to Mrs. Norris or her young daughter Marjorie, asking them to come to see her, and on June 5, 1941, in response to such a request, they went to testatrix' home and found her locked in her room where she had been

confined for several days without food, air or attention. The doctor, who was called in the emergency, stated that testatrix should not be left alone, whereupon Mrs. Norris volunteered to take her home and care for her. Thereafter, testatrix remained in bed for a couple of weeks, but apparently recovered and continued to make her home with appellants until she died on November 23, 1941, at the age of seventy-nine years.

On June 5th or 6th, testatrix told Mr. Norris that she wanted to make a will in favor of Mrs. Norris, and in the words of Mr. Norris "she just kept it up until finally I went and got Mr. Morgan (the attorney who drew the will). I wanted her to wait, and she said no. . . . 'I want to make a will to your wife'." It is apparent from the record that appellants at the time they took testatrix into their home believed she was a woman of very limited means, but that when she requested Mr. Norris to get a lawyer to draw her will, she handed him savings bank books showing accounts in two banks aggregating $7,700.

The document offered for probate was executed by testatrix on June 9, 1941, at the home of appellants and was witnessed by Mr. Norris and Mr. Ernest V. Morgan, the attorney who prepared it. With respect to the drawing and execution of said will, Mr. Morgan testified that he had never met Mrs. Norris, but "had seen Mr. Norris from time to time during the year preceding, he being a newsboy on the corner and I merely bought newspapers from him . . . he told me that he wanted me to come out to his home to see a person who was living with them, about the making of a will. . . . I questioned him as to what the property was, and he said there was a savings account. I asked whether she had any real property and he said not that he knew of, and that she wanted to leave her property, whatever she had, to his wife. I asked him whether she had any relatives and he said yes, she had a cousin back East, and as far as he knew there were no others. I said, 'Well, I will prepare a form of a will and take it out, and if it is satisfactory we can have it executed', and I drew up this draft of a will and took it out with me." When Mr. Morgan and Mr. Norris arrived at the latter's home, the testatrix was in bed "seated against the back of the bed, with the pillows back of her, in a semi-reclining position. . . . He (Mr. Norris) introduced me as the attorney, and he asked her

whether she wanted to make a will, and she said she did, and I told her I had a form made out and that if it was satisfactory she could execute that will. She said that she wanted all of her property left to Mrs. Norris, because the Norrises had been very kind to her over a period of years; and· I asked her whether she had any relatives she wanted to leave any property to, and she said she had a cousin, that she had never done anything for her for years, and she hardly had any dealings with them and she did not want to leave them any of her property. . . . She read the will over first and asked me to read it to her, which I did, and explained each one of these provisions as we went along, that her debts would be paid and that after the debts were paid that Mrs. Norris would get all of the property, and she said that was exactly what she wanted; and I asked her who she wanted to name as executor to take charge of her estate, and she said she wanted Mr. Norris, and at that time the name of Samuel E. Norris was written into the paper.'' That Mr. Norris was in the room all of the time, and Mrs. Norris was there part of the time; and that after it was executed by Miss Agnew and witnessed by himself and Mr. Norris, Miss Agnew ''gave the will to me and I carried it back to the office and put it in her file.''

Thereafter, on August 25, 1941, the testatrix caused her principal bank account to be transferred into a joint tenancy account between herself and Mrs. Norris, the latter succeeding thereto as the survivor upon Miss Agnew's death.

It appears from the record that shortly after Miss Agnew came to appellants' home to live, to wit, on June 11, 1941, she sent Mrs. Norris to the bank to draw $35 from her savings account, at which time Mrs. Norris encountered some difficulty, the bank requiring her to take a check home for Miss Agnew to sign; on June 17th, Mrs. Norris withdrew $35 from the account on a written order signed by Miss Agnew, and on June 24th, she withdrew $35 on a written order from Miss Agnew accompanied by a letter from the physician who was then attending Miss Agnew. On this latter occasion, Mrs. Norris was told that no more checks would be honored, and on August 25, 1941, Miss Agnew, accompanied by Mrs. Norris, called at the bank to withdraw her account, and was advised by Mr. Winston, one of the officers, to see a lawyer. Thereupon, Miss Agnew and Mrs. Norris went to see Mr. Morgan, who returned with them to the bank, and Miss Agnew

received from the bank a cashier's checks for $7,301, the balance then remaining in her account.

With respect to this transaction, Mr. Morgan testified that on August 25, 1941, Miss Agnew and Mrs. Norris came to his office and Miss Agnew told him "that the bank made some objection to her check, on a check to have her funds withdrawn from the bank, and she wanted me to go over there with her to see if it was possible to get her money out of the bank. . . . We went up to see the chief teller . . . Mrs. Norris sat down on a bench and Miss Agnew and I stood at the counter, and we asked that—— I asked him why he had not allowed Miss Agnew to draw her money from the bank, and he said the signature wasn't very good on the check she had drawn. . . . He gave us a check and asked Miss Agnew to come to the counter and sign it, which she did." That Miss Agnew did all the talking and paid him $10 for his services. During this time "Miss Agnew said she was going to open a bank account closer to the residence of the Norrises, so it would not be so difficult to draw money out when it was necessary to draw it. . . . She said also that she wanted to draw—— to make a joint account with Mrs. Norris, so that either one of them could draw money out, without the difficulty that she had experienced. . . . I told Miss Agnew that if she put her money into a joint bank account that Mrs. Norris would have the right to draw it out as much as she had, and she said that was what she wanted Mrs. Norris to do, that they were her best friends and she enjoyed living with them, and was having the best time she ever had in her life, and she wanted Mrs. Norris to have that money when she was dead anyway, and therefore she was opening the joint bank account with her, and I explained that in a joint bank account there would be no necessity for the probate of the will, and if that was her wish that she could obviate any necessity of having the expense of probating the will of this type." In rebuttal, Mr. Morgan testified with respect to this joint tenancy account as follows: "She (Miss Agnew) came to the office for the purpose of drawing the money out of the bank. We then left the office and went over and received the check and then came back to the office. At that time the question arose as to the depositing of the money in a joint account with Mrs. Norris, and I explained to Miss Agnew that if they made it a joint

account that Mrs. Norris would have equal control over that money, and could draw it out at any time, and she said that was what she wanted Mrs. Norris to do if it was necessary; and I also explained that upon her death the funds would pass by survivorship to Mrs. Norris, and that the will would be of no account, that is, that it would not have to be probated, and she said that was entirely satisfactory to her, as she wanted Mrs. Norris to have all of the money anyway. She also stated that she had been treated very kindly.'' Mr. Morgan further testified that on the day the will was executed by Miss Agnew, he believed she was of sound mind.

About a year after Miss Agnew's death, appellants were informed by the representative of a bureau engaged in locating missing heirs, that Miss Agnew had an estate in Massachusetts, and this fact having been confirmed by Mr. Morgan through correspondence with the Register of the Probate Court of Worcester, Massachusetts, Mr. Norris on December 28, 1942, filed his petition for probate of the will and for the issuance to him of letters testamentary, in which he listed the name of Katie Laraia, as an heir at law of decedent. Mrs. Laraia filed her contest to the petition for probate on the grounds of testamentary incapacity and undue influence exerted upon Miss Agnew by the appellants Norris.

The court found, among other things, that ''Samuel E. Norris and Edith M. Norris exercised undue influence over the mind and will of said decedent; that said decedent was unable due to her weakened condition of mind and body to resist said influence. That said decedent at said time was not competent to execute any document of a testamentary nature or character. . . . That as a result thereof, said Samuel E. Norris and Edith M. Norris procured the making of an unnatural and unjust will and that said will was not the free and deliberate act of said decedent; that Samuel E. Norris and Edith M. Norris, his wife, actually participated in procuring the execution of said document as a result of coercion and fraud.''

It is here contended (1) that ''testatrix had testamentary capacity and that there is no support in the evidence for the findings of the trial court to the contrary''; (2) that ''there was no undue influence, fraud or coercion and the findings of fact to that effect are wholly unsupported by any substantial evidence or legitimate inference therefrom.''

■ Upon the question of testamentary capacity, it was stated in *Estate of Arnold,* 16 Cal.2d 573, 585 [107 P.2d 25] : ''It is well settled that mere proof of mental derangement or even of insanity in a medical sense is not sufficient to invalidate a will, but the contestant is required to go further and prove either such a complete mental degeneration as denotes utter incapacity to know and understand those things which the law prescribes as essential to the making of a will, or the existence of a specific insane delusion which affected the making of the will in question. (*Estate of Shay,* 196 Cal. 355, 359 [257 P. 1079] ; *Estate of Russell,* 189 Cal. 759, 769 [210 P. 249].) . . .

'' 'Ability to transact important business, or even ordinary business, is not the legal standard of testamentary capacity; though it seems to be quite generally but mistakenly supposed, outside of the ranks of the legal profession, that a capacity to transact important business is the criterion of fitness to make a valid will. Says the Iowa Supreme Court (*Perkins v. Perkins,* 116 Iowa 253 [90 N.W. 55]) : ''While, as every lawyer knows, a man may be capable of making a good will after he is so far gone in imbecility and mental darkness as to be no longer capable of making a valid deed or of transacting business generally, the very opposite conclusion seems to pervade the lay mind, and the making of a will is, to its apprehension, the one item of business which requires the presence of all one's faculties in their normal strength.'' ' (*Estate of Sexton,* 199 Cal. 759, 768 [251 P. 778].)

''Further, this was said in the same case, at page 764: 'A testator is of sound and disposing mind and memory if, at the time of making his will, he has sufficient mental capacity to understand the nature of the act he is doing, to understand and recollect the nature and situation of his property and to remember, and understand his relations to, the persons who have claims upon his bounty and whose interests are affected by the provisions of the instrument.'

''Still further in the same case, the court said, at page 766: 'Testamentary capacity is always presumed to exist until the contrary is established. That is to say, the presumption is always that a person is sane, and the burden is always upon the contestant to show affirmatively and by a preponderance of evidence that the testator, at the time of executing the

will, was of unsound mind. (*In re Wilson,* 117 Cal. 262 [49 P. 172, 711]; *Estate of Perkins, supra,* (195 Cal. 699 [235 P. 45]); 26 Cal.Jur. 756.)' . . .

" 'A person who has mental power to understand and to transact the ordinary business affairs of life doubtless has capacity to make a valid will. But the converse is not necessarily true. Mental perception and power to think and reason of a lesser degree than that which is required in the understanding and transaction of ordinary business may be all that is requisite to the full understanding of everything involved in the execution of a will.' (*Estate of Sexton, supra,* 199 Cal. 759, 769.)' "

The record shows that Miss Agnew was somewhat eccentric: She slept on a spring cot without a mattress, using a blanket or blankets instead; that she did not want the mattress because it was one her deceased brother had used. Also, she used candles, which was explained by the fact that her quarters were equipped with gas mantles which "were old fashioned and Katie (Miss Agnew) was afraid to use them. Her brother had taken care of that before he died, and she did not understand it and she was afraid to use them, so she bought candles. . . . There were no electric lights in the house." That when Miss Agnew arrived at the Norris home, she wanted to go to bed with her clothes on; that her clothing was soiled and worn, could not be cleaned and when laundered it fell to pieces.

About a week prior to June 1, 1941, Mrs. Snura (the wife of the owner of the property who had known Miss Agnew for fifteen or sixteen years and saw her at least once a month when she collected the rent, called at Miss Agnew's and received the rent for the month of June, at which time Miss Agnew asked her "several times how long that paid up to." Mrs. Snura also testified that Miss Agnew seemed to be forgetful; "would forget what day it was and things like that, and she would ask you those things sometimes three or four times, but otherwise she seemed to be all right. . . . she was a very timid little woman; she was like a child in a way." Within a week or two after June 4, 1941, Mrs. Snura went to call on Miss Agnew at the Norris home; that Miss Agnew appeared to be a little weak and was in bed but her conversation was coherent and her answers were responsive to the witness' questions.

Dr. Walla, who attended Miss Agnew at the Norris home in June, 1941, at about the time the will was executed, testified: "I saw an elderly little lady in a rather feeble emaciated condition. . .·. I had a conversation with her personally, not with anybody in the house, but I directed my conversation to her directly. I asked her her age and she said she was 79 years of age. She said she was just a short time in the home of Mrs. Norris and that she was feeling dizzy and that she felt a little weak and had a sore back. I checked her heart and lungs and did not find very much wrong with her lungs. They seemed to be clear. Her heart was skipping a little bit and her blood pressure was 145 over 70 which is fairly normal. Her appearance in general was that she was a little frail, and, as I mentioned before, rather under-nourished." When the doctor finished his examination, Miss Agnew asked him the amount of his fee, reached into her pocketbook and handed him the money "did the actual business with me like any other patient." The doctor called on Miss Agnew again about ten days later to check up on her condition at which time she appeared to be more cheerful; "and gave no suspicion that her mentality was weakened in any way; that is, she did not give me that impression"; and in his opinion she was in possession of her faculties to such a degree as to be capable of looking after her own affairs.

Mrs. Coughtry, a teacher in the Los Angeles City School System, testified that she had known Miss Agnew for about seven years having first met her at Mrs. Norris' home when the latter lived adjacent to Miss Agnew on Myrtle Street; that Miss Agnew visited at the witness' home with Mrs. Norris in the summer of 1941, and that Miss Agnew joined in the conversation and appeared to have no difficulty in hearing.

Mrs. Matheson, an insurance agent and superintendent of the Sunday School at Knox Presbyterian Church, knew Miss Agnew from August, 1941, until the date of her death. This witness testified that she met Miss Agnew every Sunday morning during that period, including the day on which she died; that she did not notice anything peculiar about Miss Agnew, who needed no assistance from anyone and took part in the services, singing with the children.

Mrs. Durr, a neighbor of the Norrises, testified she had known them about eighteen months, and during the summer

of 1941 she saw Miss Agnew around the place and on the porch of the Norris home; that Miss Agnew attended a P.T.A. meeting with Mrs. Norris and that the witness sat with them; that she "talked loud to her (Miss Agnew) because most older people do have (difficulty in hearing) but I did not have any trouble in making her understand and she did not have any trouble in answering me"; that her answers were responsive to the questions asked.

Early in June, 1941, when decedent's intention to create a joint account with Mrs. Norris was in process, the bank sent its representative, Mr. Rushey, to the Norris home to interview Miss Agnew relative thereto. This witness testified that he found Miss Agnew in bed and that he held a regular conversation with her and Mrs. Norris, but he did not remember just what was said; that Miss Agnew got to her feet as he was leaving; that he did not complete the arrangements creating the joint account "because her (Miss Agnew's) mind seemed to me like it would drift off onto other subjects altogether that had no bearing on the case at all . . . she mentioned something about a distant relative in the East, and naturally, just coming out of the hospital, I did not know whether she knew what she was doing, and as a rule we require a doctor's presence in order to make an account joint, and at that time there was no doctor there, and I did not go through with it and it was referred back to the office"; that he reported to his superior officer that the account should not be made until Miss Agnew could get into the bank herself, which she did in August, 1941, as heretofore outlined.

In *Estate of Nolan*, 25 Cal.App.2d 738, 744 [78 P.2d 456], it is stated: "The testimony of the witnesses upon which the contestants rely must be measured by the rule that their opinion that the testator was of unsound mind 'is of no greater value than the reasons given in support of the opinion'. (*Estate of Flint*, 179 Cal. 552, 553 [177 P. 451]; *Estate of Redfield*, 116 Cal. 637, 655 [48 P. 794]; *Estate of Finkler*, 3 Cal. 2d 584, 594 [46 P.2d 149].) In the latter case the court approved this statement taken from *Stackhouse* v. *Horton*, 15 N.J.Eq. 202: 'No judicial tribunal would be justified in deciding against the capacity of a testator upon the mere opinion of witnesses however numerous or respectable. A man may be of unsound mind, and his whole neighborhood may declare him so. But whether that unsoundness amounts to incapacity for a discharge of the important duty of making a final dis-

posal of his property, is a question which the court must determine upon its own responsibility.' . . . The case may be summed up in the language of *Estate of Wright*, 7 Cal.2d 348, 356 [60 P.2d 434], reading: 'Tested by the decisions of this court the judgment is wholly without evidentiary support. There is no evidence that testator suffered from settled insanity, hallucinations or delusions. Testamentary capacity cannot be destroyed by showing a few isolated acts, foibles, idiosyncrasies, moral or mental irregularities or departures from the normal unless they directly bear upon and have influenced the testamentary act. . . . The burden was upon contestant throughout the case. Taking all the evidence adduced by contestant as true, it falls far below the requirements of the law as constituting satisfactory rebuttal of the inference of testamentary capacity.' ''

In the recent case of *Estate of Johanson*, 62 Cal.App.2d 41, 49 [144 P.2d 72], it was stated that the ''test, which is not a difficult one to meet, is that one has testamentary capacity, 'if he is able to understand and carry in mind the nature and situation of his property and his relations to his relatives and those around him, with clear remembrance as to those in whom and those things in which he has been mostly interested, capable of understanding the act he is doing, and the relation in which he stands to the objects of his bounty.' (*Estate of Motz* (1902), 136 Cal. 558, 562 [69 P. 294]; 26 Cal.Jur. 639.) A more rigid test would invalidate many wills, for it is of common knowledge that the making of wills is often deferred until the testator is in contemplation of impending death through old age or sickness. As a consequence many wills are made, and validly made, by those who no longer have ability to conduct their business affairs because of loss of mental vigor or partial loss of memory. Extreme care should be exercised in applying the settled rules to the facts of a given case, as a decision at variance with those rules would set an unfortunate precedent.''

Applying the rules of law hereinbefore referred to to the facts disclosed by the record herein, it would appear that the findings of the trial court that testatrix lacked testamentary capacity to make the will here in question are not supported by the evidence.

As was stated by this court in the *Estate of Hull*, 63 Cal.App.2d 135, 143 [146 P.2d 242]: ''The burden was

on the contestants to show undue influence, and in meeting that obligation it is not sufficient for them merely to show circumstances consistent with the exercise of undue influence, but before a duly and solemnly executed will can be invalidated, circumstances must be shown that are inconsistent with freedom of action on the part of the testatrix. (*Estate of Burns, supra,* (26 Cal.App.2d 741, 749 [80 P.2d 77]).)''

On the question of undue influence, the Supreme Court in *Estate of Arnold,* 16 Cal.2d 573, 577 [107 P.2d 25], said: ''In an action to set aside a will of a deceased person on the ground of undue influence, it is necessary to show that the influence was such as, in effect, to destroy the testator's free agency and substitute for his own another person's will. (*Estate of Motz,* 136 Cal. 558, 583 [69 P. 294].) Evidence must be produced that pressure was brought to bear directly upon the testamentary act. (*In re McDevitt,* 95 Cal. 17, 33 [30 P. 101].) Mere general influence, however strong and controlling, not brought to bear upon the testamentary act, is not enough; it must be influence used directly to procure the will, and must amount to *coercion* destroying free agency on the part of the testator. (*Estate of Keegan,* 139 Cal. 123, 127 [72 P. 828].) It is further held that mere opportunity to influence the mind of the testator, even coupled with an interest or a motive to do so, is not sufficient. (*Estate of Easton,* 140 Cal.App. 367, 371 [35 P.2d 614].)

'' 'The unbroken rule in this state is that courts must refuse to set aside the solemnly executed will of a deceased person upon the ground of undue influence unless there be proof of ''a pressure which overpowered the mind and bore down the volition of the testator at the very time the will was made.'' ' (*Estate of Gleason,* 164 Cal. 756, 765 [130 P. 872].)''

Respondent urges that ''Where one who unduly profits by a will sustains a *confidential relationship* to the testatrix and actively participated in procuring the execution of the will, the burden is upon him to show the will was not induced by his undue influence.''

The court did not find that a confidential relationship existed between appellants and testatrix, but an examination of the record reveals that appellants sustained the burden of proof and established the due execution of the will, the testamentary capacity of testatrix, as well as her freedom from coercion, fraud or undue influence exercised by appellants.

Proponents' Exhibits 7 and 8, consisting of a number of letters written during the last four years of her life by testatrix to Mrs. Norris, reveal that while testatrix was somewhat illiterate, she had a direct and positive personality and a generous disposition. She was a working woman, ostensibly of limited means, but she was apparently very fond of Mrs. Norris and the latter's young daughter, Marjorie. Consequently, she often wrote to Mrs. Norris asking her either to come to see her, or to meet her at Clifton's or Leighton's for dinner. In these instances, testatrix usually offered to pay Mrs. Norris' carfare and often paid for their dinners. When testatrix' brother died in 1936 and Mrs. Norris assisted her, the testatrix told her then that she would be rewarded for her kindness; and again in 1941, on the day that Mrs. Norris took testatrix to the former's home after finding Miss Agnew weak and exhausted, Miss Agnew told her, "Remember all that I have goes to you." During all of this period testatrix was corresponding with her cousin, the respondent.

There is not the slightest evidence that Mrs. Norris actively participated in the execution of the will which named her a beneficiary, although she was in and out of the room and brought the bread board upon which testatrix was accustomed to write when confined to the bed. Mrs. Norris testified that testatrix "did not talk to me about making a will at all . . . I had nothing to do with it."

At testatrix' request, Mr. Norris procured the services of Mr. Morgan in drawing the will; also, he was present and witnessed the execution of the will, but there is no evidence that he used any coercion or duress or exerted any undue influence in that regard. To the contrary, Mr. Norris testified that when testatrix requested him to get a lawyer to draw her will that he urged her to wait, but that she kept after him until he finally asked Mr. Morgan to come out to his house to see her.

Taken as a whole, the evidence produced by respondent was entirely insufficient to support the findings of testamentary incapacity and undue influence.

For the reasons stated, the judgment is reversed and the trial court is directed to admit the will to probate.

Doran, J., and White, J., concurred.

A petition for a rehearing was denied September 21, 1944.