[Civ. No. 20348. Second Dist., Div. Three. Jan. 14, 1955.]

Estate of HAROLD W. DUNNE, Deceased. ADDIE MAY WEST, Appellant, v. DORATHY L. HARTER, Respondent.

Woodrow W. Baird for Appellant.

Harold E. White for Respondent.

SHINN, P. J.—This is an appeal from a judgment denying probate of a will of December 8, 1952, offered by the petitioner and appellant, Addie May West, and admitting to probate a holographic will offered by the contestant and respondent, Dorathy L. Harter, which bears the date of March 5, 1952.

The testator, Harold W. Dunne, was about 53 years old at the time of his death on March 6, 1953. Shortly after the death of his wife in February of 1952, decedent entered the Long Beach Veterans Hospital for treatment of a serious illness. Just before going into surgery decedent on March 5, 1952, duly executed a holographic will naming Chris Nelson, his deceased wife's stepfather, Dorathy Harter, sole contestant, Donald Walsh and Earl Walsh as equal beneficiaries of his estate. Dorathy Harter, Donald Walsh and Earl Walsh are stepchildren of Dunne by a previous marriage of his deceased wife. Dorathy Harter was named as executrix without bond. Later in March, after being released from the hospital, Dunne returned to his own home, where he was cared for by Chris Nelson, his stepfather-in-law, with whom he lived. Sometime in April, Addie May West, with a friend, came to visit Mr. Dunne. There was evidence that Mrs. West and her deceased husband, Tom West, had been acquaintances of the Dunne family for several years. At the time

of this visit decedent learned of the death of Mrs. West's husband in 1951. Mr. Dunne returned Mrs. West's visit and they had dinner together on several occasions after this, until about five weeks after Mrs. West's first visit when decedent moved into Mrs. West's residence where he remained most of the time until the illness preceding his final entry into the hospital. Decedent returned to his own home for a short time in September while Mrs. West was in New York because he could not get along with her mother, who remained in Mrs. West's home. Dunne entered into an agreement as to how much he should pay as rent although he paid none. Mrs. West also loaned decedent small amounts of money, and sometimes paid expenses when they went out together during this time. Dunne proposed marriage to Mrs. West in June 1952, but she refused him. Later in 1952 they planned to be married in June 1953, until Mrs. West in February 1953 learned that Dunne was a victim of cancer. On November 24, 1952, Dunne reentered the hospital because of a respiratory infection which was superimposed on lung cancer. The evidence indicated that at this time decedent was not on the critical list, and was not in as imminently serious condition as was suspected prior to his entry. He left the hospital again on December 2, 1952, and returned to Mrs. West's residence, where he later executed the second will, duly signed and witnessed. He returned to the hospital January 20, 1953, was released in February, and returned late in February to the hospital, where he died on March 6, 1953.

The trial court, sitting without a jury, found that the will of December 8th was made when the decedent was of unsound mind, without capacity to make a will because of physical and mental weakness, and also that it was induced by undue influence and fraud on the part of the proponent, Mrs. West.

The new will, executed December 8, 1952, just six days after decedent's release from the hospital, provided for $50 bequests for the four beneficiaries under the former holographic will, and made Mrs. West the beneficiary of the residue of the estate, amounting to about $15,000.

The appellant makes two contentions, namely, there was insufficient evidence to support the finding that the deceased was of unsound mind at the time of the execution of the second will and there was insufficient evidence to support the finding that the second will was executed through undue influence and fraud.

■ As to the first contention, the test in determining whether the testator was mentally competent at the time of executing the will is whether he had sufficient mental capacity to be able (1) to understand the nature of his act; (2) to understand and recollect the nature and situation of his property; and (3) to remember and understand his relations to the persons having claims upon his bounty, and whose interests would be affected by the will. ■ The testator is presumed to be sane, and the burden is on the contestant who must show incapacity by either (1) mental incompetence generally or (2) a delusion which directly influenced the testamentary act. (*Estate of Smith*, 200 Cal. 152 [252 P. 325].)

■ Of course, not every degree of mental unsoundness or mental weakness will suffice to destroy testamentary capacity. The question of capacity is related to the mental condition at the time of the execution of the will. In discussing the question of general incompetence of the deceased, we shall first state the evidence which was most favorable to the contestant.

The record shows that decedent had delusions and at times was not entirely rational. Dorathy Harter testified that just before Thanksgiving of 1952, when she went to visit deceased at the West residence, he asked her why she had come to pick up a pick and shovel, and stated that it was 2:30 in the morning, although it was actually late in the afternoon or early evening. Earl Walsh and Mary Walsh were present at this time and testified they observed this incident. Mrs. Harter testified further that at about the same time, before he entered the hospital, deceased stated he was in great pain and that he was being given some kind of dope to relieve the pain; that he was irrational in his conversation in that he would start a conversation, quit it and then start on a new subject two or three minutes later. Mrs. Harter testified that shortly after the first of December she visited deceased at the West home, after he had returned from the hospital, and that he stated he wanted her to stay with her mother "until after the baby was born." Mrs. Harter's mother was deceased at that time. Again, prior to Thanksgiving, according to Mrs. Harter, Mrs. West told her it " . . . wasn't necessary for me to come down there and see Harold [decedent] . . . that he was asleep and wouldn't know me." Chris Nelson testified that on November 24, 1952, he observed Dunne in a "delirious condition" at Mrs. West's home, that he was "talking out of his mind . . . his mind was wandering . . .

he wasn't talking conversation with the people visiting. I couldn't say who he was talking with." Earl Walsh testified that when he visited decedent at Mrs. West's home shortly before Thanksgiving in 1952, decedent was "wandering" in his conversation and saw images on the wall of his dead wife and of soldiers marching, "more or less . . . dreaming with his eyes open." Mary Walsh testified that after the execution of the second will in January or February 1953, she and her husband visited decedent in the hospital and he wanted to know if Mr. Walsh had put that "black gas" in the car again; and that he mentioned the black gas two or three times during the visit. Donald Walsh testified that when he visited decedent at Mrs. West's home before Thanksgiving 1952, ". . . he was very thick-tongued. He was glassy-eyed. You couldn't understand his conversation. . . . When he talked, he didn't make sense." Donald Walsh also testified that Dunne thought he was building the new home that he, Donald, was building at the time. Muriel Pinkerton, secretary to Mr. Baird, the attorney who drew the will of December 8th, was present with Mr. Baird and took notes at the time of execution of the will, at which time Dunne stated that three witnesses had signed the prior holographic will executed in March 1952, when, in fact, they had not, and Mr. Dunne's signature was the only signature, although the four beneficiaries were present. Decedent stated he had only one stepsister when, in fact, the will in question lists the names of three stepsisters who were given $10 each. Mr. Baird asked decedent if he was able to get around, to which Dunne replied " . . . he was able to walk around, but he wasn't well enough to do things for himself."

The evidence we have related had reference to the approximate time when decedent reentered the hospital November 24, 1952, to one occasion shortly after he had left the hospital and to a visit made by Mr. and Mrs. Walsh in January or February, 1953. Aside from the claimed delusions there was testimony that on one occasion decedent was irrational in his conversation (testimony of Mrs. Harter); that on another occasion he was "talking out of his mind . . . his mind was wandering" (testimony of Mr. Nelson); upon another occasion his mind was "wandering" (testimony of Earl Walsh and testimony of Donald Walsh); that on the latter occasion decedent was "very thick-tongued . . . glassy-eyed . . . when he talked he didn't make sense." The court evidently believed the testimony of these witnesses and would

have been justified in believing that when decedent was unable to carry on a rational and understandable conversation, he did not at those times possess testamentary capacity. However, it could not be inferred from the fact that the conversation of the decedent was irrational on the few occasions described by these witnesses that he was irrational at all times and especially at the time of the execution of the will. There was abundant evidence that the state of mind of the decedent was generally consistent with the possession of testamentary capacity. This evidence related to many occasions other than those immediately preceding Thanksgiving 1952 and decedent's return to the hospital.

Lawrence L. Boyd, a subscribing witness to the December 8, 1952 will, testified he had known the deceased for about 10 years, that he appeared to be of disposing mind and memory at the time of execution, that it appeared he was executing his own judgment, and that he examined the will and discussed some of its contents at that time. Miss Pinkerton, secretary of Baird, testified that deceased appeared to be of sound, disposing mind at the time of the execution of the will, was able to walk around, and did not appear to be under the influence of opiates. She recorded a statement of the deceased after he executed the will, in which he stated two sheets of blank paper had been substituted for his holographic will without his consent, and that his reason for making Mrs. West the principal beneficiary was because she had been taking care of him. The testimony of the physicians who attended deceased was to the effect that he was of sound mental condition and not subject to adverse aftereffects from the opiates he was taking. Dr. Claude Wagner, M.D., examined deceased on November 24, 1952, and again on December 30, 1952, and testified that on both occasions he was in full possession of his mental faculties. Dr. Wagner, who had previously cared for decedent, said he was in ''excellent'' mental condition November 24th when he was admitted to the hospital. Dr. Boyle, who attended the deceased in the hospital from November 24, 1952, to December 2, 1952, and after January 20, 1953, until his death, testified the deceased had full possession of all his mental faculties on all occasions observed from November 24th to his death; that he observed no mental confusion and that he was mentally alert and not ''dopey'' after taking the codeine to relieve the pain. He testified that deceased was ambulatory when he left the hospital on December 2d and that he, Dr. Boyle, anticipated

that it would be possible for Dunne to work at some job part time if he took enough protein to regain a little greater strength. Mary Walsh, wife of Earl Walsh, who was present with her husband and Dorathy Harter when the alleged "pick and shovel" delusion and the "black gas" delusion occurred, testified that deceased on that occasion recognized Dorathy Harter, Earl Walsh and herself. She did not recall any conversation about a pick and shovel. Marion Beall, a registered nurse, who attended decedent while in the hospital, testified that he stated while in the hospital after his return on January 20, that he had seen to it that Mrs. West was well taken care of for her kindness in caring for him; and that he had changed his will. Chris Nelson, who had lived with decedent before he went to live at Mrs. West's residence, testified to but one occasion, above referred to, when he observed that decedent had any mental confusion. Nelson testified that otherwise decedent was rational when he visited deceased every day from December 2d to December 8th at the West home.

There is a wealth of authority to the effect that evidence of deviations from normal mental processes and capacity such as those in evidence here are legally insufficient to prove want of testamentary capacity. Full discussions of this subject will be found in *Estate of Perkins*, 195 Cal. 699 [235 P. 45]; *Estate of Selb*, 84 Cal.App.2d 46 [190 P.2d 277], and *Estate of Ridgway*, 92 Cal.App.2d 325 [206 P.2d 892].

As to the effect of delusions upon the execution of a will, the rule is that the mental condition at the time of the execution of the will is significant. The delusion must directly influence the testamentary act; the will must result from hallucination or delusion. (*Estate of Perkins*, 195 Cal. 699 [235 P. 45], *supra*; *Estate of Clark*, 100 Cal.App. 357 [280 P. 204].)

There was no evidence of a delusion or hallucination which influenced the execution of the will of December 8th. Although the testimony indicated that decedent had delusions prior to November 24, 1952, and one early in December 1952, there was no evidence of any delusion on the day of execution which was the cause of or influenced the execution of the will; the testator was seriously ill and was receiving medication to ease his pain. Any misstatements of fact by deceased as to past events were merely indications of faulty memory and not of delusions.

As to the second contention of the appellant, the rule

is well settled that to set aside a will on the ground of undue influence, evidence must be produced to show that pressure was brought to bear directly on the testamentary act, and the burden of proof in the absence of a confidential relationship is on the contestant to prove the undue influence. (*Estate of Clark,* 170 Cal. 418, 424 [149 P. 828]; *Estate of Carithers,* 156 Cal. 422, 428 [105 P. 127]; *Estate of Gleason,* 164 Cal. 756, 765 [130 P. 872]; *Estate of Lavinburg,* 161 Cal. 536, 543 [119 P. 915]; *Estate of Llewellyn,* 83 Cal.App.2d 534, 561 [189 P.2d 822, 191 P.2d 419].) There was no allegation of a confidential relationship between Dunne and Mrs. West nor were any facts alleged that would relieve the contestant of the burden of proof of undue influence.

Dorathy Harter testified that Mrs. West told her it would not be necessary for her to come down and see "Harold" (Mr. Dunne). Mrs. Harter further testified that just prior to Thanksgiving 1952, when she went to visit her stepfather at the West home, Mrs. West tried to shut the door and "I pushed it open and said I was going in to see Mr. Dunne." This was the only evidence that Mrs. West made attempts to keep the relatives away from deceased.

Testimony of a bank representative was to the effect that decedent's savings and checking accounts originally opened in the name of Harold W. Dunne were converted to joint tenancy in the name of Addie May West and deceased. Mrs. West also became the beneficiary of deceased's insurance policy.

Earl Walsh, who testified he had visited Dunne practically every day after his return from the hospital on December 2d, said Dunne appeared to be under Mrs. West's influence in his thinking. "One time he told me that she wanted him to sign some papers—I don't know nothing of what they were—and he said he didn't want to sign them." In response to questions as to what kind of papers, Walsh testified, "He didn't say. . . . He didn't sign them." He also testified that Mrs. West told him, " . . . that if I stuck by her and Chris, I would be taken care of." Mary Walsh also testified she overheard this conversation; that Mrs. West wanted " . . . Chris, Mr. Nelson and my husband to stick together until this trial was over, that she would see that he would be taken care of . . ." Apparently this occurred during or shortly before the trial. Muriel Pinkerton, in answer to a question as to whether Mrs. West was present at the time of execution of the will, stated "I heard someone else in the house, but I did not see her."

For the proponent, Eleanor Pearce, a friend of appellant, testified she visited Dunne at the West home on December 7th, one day before the execution of the second will and that while Mrs. West was out deceased told her that Dorathy Harter had been to see him and " . . . had been hounding him for some linens that her mother had, and also borrowed money, and then she stole the will. . . . It makes me so . . . mad. I am going tomorrow and make a new will." Robert Cooper testified that a few days before the date of execution of the will of December 8th deceased had told him he was going to change his will. Mrs. West testified she did not know of the new will making her principal beneficiary until December 10th or 11th and that decedent had never previously discussed making a new will with her. Lawrence F. Boyd, subscribing witness to the December 8th will, testified that about a week after the will was executed deceased called him by phone from the Veterans of Foreign Wars Post and asked him to come down, that they had a conversation and Dunne said "I want to be sure of one thing, if you can be sure in your lifetime, that you see that this will that I made is carried out to the fullest extent of your ability." Marion Beall, registered nurse, testified that while Dunne was in the hospital after his return on January 20, 1953, he told her he had changed his will and that he was going to take care of Mrs. West for her kindness and care for him. There was also testimony that Dunne wanted to have Mrs. Harter excluded from his ward and that on one occasion loud talking was heard between deceased and Mrs. Harter. Unknown to Dunne, his holographic will of March 1952, which was placed in a safety deposit box, had been replaced with two blank sheets of paper. He mentioned this to Eleanor Pearce and in the statement taken by Miss Pinkerton on December 8, 1952.

Certainly Mrs. West had an opportunity to exert undue influence upon deceased. ■ It is well settled, however, that a mere showing of opportunity to exert undue influence is not sufficient to support a finding that it was exerted. (*Estate of Fleming*, 199 Cal. 750 [251 P. 637] ; *Estate of Bryson*, 191 Cal. 521 [217 P. 525].) ■ A suspicion of undue influence is not sufficient to overthrow a will. (*Estate of Kilborn*, 162 Cal. 4, 13 [120 P. 762].) ■ Nor does conduct inspiring affection and gratitude constitute undue influence. (*Estate of Doty*, 89 Cal.App.2d 747 [201 P.2d 823].)

Miss Pinkerton testified that the will was prepared before she and Mr. Baird went to see decedent. Mr. Baird had

previously acted as Mr. Dunne's attorney. Mrs. West had done housecleaning in Mr. Baird's home. For some unexplained reason Mr. Baird was not called as a witness. ■ It is usually of considerable importance in a will contest to ascertain whether the testator or some beneficiary caused the will to be prepared and gave information as to the provisions to be incorporated therein. But we do not see that the failure to prove that fact could operate in favor of either party as against the other. It is sufficient that Mrs. West was not shown to have been active in the preparation of the will. She never discussed it prior to its execution; she was not present when it was executed and it was some time thereafter that she learned of its existence.

The court found that decedent was under the influence of opiates when he signed the will. There was no evidence to that effect. There was no evidence of the existence of a trustee relationship between Mrs. West and decedent and no evidence that Mrs. West used undue influence to bring about execution of the will. The court found that the will was induced by the fraudulent representations of Mrs. West. There was no evidence of any false or fraudulent representation. ■ It may be conceded that the generosity of decedent to Mrs. West was out of proportion to what she deserved, but that was for him to decide. He had a right to place his own valuation upon her kindness and her services. She gave him a home and care during his fatal illness and since he was competent to declare what her ministrations were worth to him, and acted voluntarily, it does not reflect upon the validity of the will that he may have been overgenerous.

The judgment is reversed and the court is directed to make new findings and conclusions consistent with the views herein expressed and to admit to probate the will of December 8, 1952, and to vacate the order admitting to probate the will of March 5, 1952.

Wood (Parker), J., and Vallée, J., concurred.

A petition for a rehearing was denied February 1, 1955, and respondent's petition for a hearing by the Supreme Court was denied March 9, 1955. Carter, J., and Schauer, J., were of the opinion that the petition should be granted.