[Civ. No. 8747. Third Dist. Apr. 20, 1956.]

Estate of ERMINA BULLOCK, Deceased. BELA SMITH et al., Respondents, v. NELLIE B. SMITH, as Legatee, etc., Appellant.

Busick & Busick for Appellant.

Bradford, Cross, Dahl & Hefner for Respondents.

VAN DYKE, P. J.—This is an appeal from a judgment denying probate of the last will and testament of Ermina Bullock, deceased, who the jury by its verdicts found was of unsound mind and under the undue influence of "another person" at the time of its execution. Appellant maintains that the evidence is insufficient to support the verdicts and the judgment entered thereon.

The testatrix died on June 24, 1953, as the result of a cerebral hemorrhage. She was then approximately 83 years of age and had been a widow for 10 or 15 years. Her heirs at law were her brother and two sisters, the respondents herein, all of whom lived in Iowa and whom, apparently, she had not seen for many years. The testatrix' holographic will, the probate of which was contested by respondents, was executed on December 31, 1952. By it she left her entire estate to the appellant who was her closest friend and whom she had known for approximately 40 years. The testatrix' home, in which she lived alone, was two or three blocks from that of appellant and her husband. They saw her on the average of three or four times a week and were very kind to her. She depended upon them to take her to the meetings of the Rebekah Lodge in which lodge she and appellant had been very active in past years. The lodge appears to have been the testatrix' main interest in later life. She liked to recall the lodge conventions which she and appellant had

attended together and past and present affairs of the local branch were the main topic of her conversations with members who visited her during her last illness which was of more than a year's duration.

On May 27, 1952, the testatrix telephoned appellant's husband and said that she did not feel well enough to attend a lecture to which he and appellant had planned to take her that evening. Appellant's husband went to see if there was anything he could do for the testatrix but she assured him that she was not ill and would be all right. However, later in the day, a neighbor became alarmed and had the testatrix taken by ambulance to the county hospital where she remained until June 6th. On May 29th the testatrix asked appellant's husband to have Mr. Busick, a local attorney, come to the hospital to draw her will. Mr. Busick had known the testatrix for over 40 years and had been her husband's lawyer. On June 6th appellant's husband brought Mr. Busick to the hospital to see the testatrix. She informed him that she wished to make a will leaving everything to appellant and her husband. Mr. Busick testified that he asked appellant's husband to leave the room so that he might talk to her privately. He asked her if she did not wish to leave something to the Odd Fellows or to the Odd Fellows Home for which her husband had been a trustee for many years. She replied that she did not and repeated that she wished to leave everything to appellant and her husband. Mr. Busick then wrote out a will which so provided and read it to her. A social worker at the hospital was called in and she and Mr. Busick witnessed the will which the testatrix signed with an "X," presumably because she was too weak to write her name. It should be here observed that although this will was not offered for probate, much of the evidence upon which the respondents rely to support the jury's findings of mental incapacity and undue influence relate to the time of its execution rather than to December 31, 1952, the date of the testatrix' later holographic will, which is the subject of the present controversy.

On June 7th, at the testatrix' request, appellant's husband contacted Dr. Lee, who had formerly acted as her physician, and had him arrange for the testatrix to be transferred to Mercy Hospital where she remained until June 11th when, at Dr. Lee's suggestion, she was moved to a nursing home where she remained until her death more than one year later. The proprietress of the nursing home testified that the testa-

trix was in a semiconscious condition on the day of her admittance to the home but that, considering her age, she showed great physical improvement and "cleared up quite rapidly to where she responded and talked, and swallowed." However, this witness testified that she considered the testatrix incompetent at all times because she was repetitious and childish, never seemed to ask any questions about current events, only remembered things pertaining to the past, and would not discuss what she was reading but would merely shrug and remark: "Well, it passes the time." The witness stated that the testatrix recognized people and conversed with her visitors about members and meetings of the lodge and appeared to remember some of it; further that she had no difficulty in making the testatrix understand things if she got her full attention.

Dr. Lee testified that on June 7, 1952, when the testatrix was transferred to Mercy Hospital, she was very ill, incoherent, confused, and incompetent to make a will; she was very frail, weighing at the most 73 pounds, and suffered from arteriosclerosis with cerebral encephalopathy (softening or damaging of the brain), high blood pressure, lack of bladder control, partial deafness, and malnutrition; that due to the nature of her illness, which causes progressive brain degeneration, a condition which can neither be cured nor improved, he was firmly convinced the testatrix was incompetent to make a will at all times between June 7, 1952, when he first saw her and June 24, 1953, when she died. However, he also said that the only calls for which he charged her during that period were made on June 11th, 16th, 18th, 25th and August 4, 1952, and on February 9th and June 18, 1953. He had no record of having seen her on or near December 31, 1952, the date of her holographic will. Dr. Lee explained that he did not see testatrix more frequently as her condition was such that he could do little for her. On the average of once a month he would stop at her door and pass the time of day when he was at the nursing home to see other patients. He said the testatrix recognized him and would wave when she saw him walking down the hall and on one occasion inquired about his father-in-law whom she had known. Dr. Lee discounted this by drawing an analogy to a dog who would recognize him but who was not competent to make a will. He testified that he believed the testatrix was mentally incompetent because she was repetitious, appeared childish

and confused, could not explain why she moaned in her sleep, and had no appetite, all of which he stated were symptoms of advanced senility.

On the authority of decided cases this record is insufficient to support a finding of testamentary incapacity. (*Estate of Doty,* 89 Cal.App.2d 747, 751-752 [201 P.2d 823]; *Estate of Powers,* 81 Cal.App.2d 480, 482-483 [184 P.2d 319]; *Estate of Wellauer,* 107 Cal.App.2d 268 [236 P.2d 906]; *Estate of Sexton,* 199 Cal. 759, 769-770 [251 P. 778]; *Estate of Shay,* 196 Cal. 355 [237 P. 1097].) ▇ Neither the nursing home proprietress nor Dr. Lee was asked whether or not the testatrix was capable of recalling the nature and extent of her estate, the natural objects of her bounty, and of understanding the nature of the act she was doing. In the absence of evidence to the contrary, it must be presumed that she did. (*Estate of Shay, supra,* at pp. 359-361.) ▇ Dr. Lee's conclusion that the testatrix was incompetent to make a will amounted to no more than his belief that she was of unsound mind in the medical sense. (*Estate of Arnold,* 16 Cal.2d 573, 587 [107 P.2d 25].) His testimony in no way establishes that the testatrix was so incompetent in the legal sense as to be incapable of making a valid, testamentary disposition of her property. In what we have said as to the insufficiency of the evidence to support a verdict of incompetency we are not unmindful of the rule so well stated in *Estate of Teel,* 25 Cal.2d 520 [154 P.2d 384]. But it is obvious that no witness gave facts of her condition when she wrote her own will which as of that time would give support to the jury's verdict of testamentary incapacity. That insufficiency is well disclosed by the discussion in *Estate of Powers, supra.*

On the other hand, there is more than ample evidence that the testatrix had the mental capacity to execute a valid will. "[T]he will itself bears mute evidence of testator's competency." (*Estate of Jamison,* 41 Cal.2d 1, 13 [256 P.2d 984].) A few weeks after the testatrix was placed in the nursing home, she was served with a copy of a petition for appointment of her second cousin as her guardian. Upon her own initiative the testatrix sent for the attorney of her choice, Mr. Busick. She lucidly related what had transpired and told Mr. Busick she did not wish her cousin to act as her guardian as they were not friends. Mr. Busick testified that the testatrix was in good condition except for being bedridden and that she told him in detail about the service

of the papers upon her and what she wanted done. However, the cousin was appointed guardian despite the testatrix' objections. Sometime thereafter the testatrix again sent for Mr. Busick and asked him to have her taken elsewhere as she did not like the treatment which she was receiving at the nursing home. Mr. Busick explained this could not be done without the consent of her guardian. She again sent for him about the middle of January, 1953, and made the same request. During that visit she handed Mr. Busick her holographic will, which bore the date of December 31, 1952, and asked him to keep it, which he did. Such voluntary entrustment of possession of her will to her personal attorney for whom she had sent is cogent evidence that the testatrix was of sound mind and not acting under undue influence of any person.

It is true that the testatrix was practically bedridden from May 27, 1952, until the time of her death on June 24, 1953. However, she was able to sit up in a chair for short periods, read, and have visitors, one of the most frequent of whom was appellant who saw her three or four times a week while she was in the nursing home. A number of members of the years called on her regularly. They found her mentally alert Rebekah Lodge whom the testatrix had known for many and testified that she displayed a remarkable memory. Two of the nurses who attended the testatrix attested as to her mental competency. She conversed with her visitors and at Christmas time showed them the cards which she had received. Appellant visited her on the day before, the day of, and the day after December 31st, the date which her holographic will bore, and she testified that the testatrix was then of sound and disposing mind. Other friends who visited her during the holiday season were of like opinion. There is no evidence that the testatrix was irrational or mentally deranged at the exact time of the execution of her will.

There is no evidence that the execution of testatrix' will was induced by the undue influence of anyone. Appellant testified that she did not know of its existence until Mr. Busick telephoned her after the testatrix' death and there is no evidence to the contrary. There is no evidence that either appellant or her husband was present when the testatrix wrote her will nor when she gave it to her own attorney for safekeeping. There is no evidence that appellant or her husband was active in procuring its execution. (*Estate of*

*Lingenfelter,* 38 Cal.2d 571, 585-586 [241 P.2d 990]; *Estate of Welch,* 43 Cal.2d 173, 178 [272 P.2d 512]; *Estate of Wellauer, supra,* at p. 273.) ▮ The mere fact that they may have had the opportunity and ability to unduly influence. the testatrix will not, standing alone, support a finding that they did. And, of course, there is no evidence that the testatrix was influenced by "another person." ▮ It was not unnatural that the testatrix wished to leave her estate to her most intimate friend in preference to her relatives whom she seldom saw. (*Estate of Doty, supra,* at p. 755; *Estate of Dunne,* 130 Cal.App.2d 216, 225 [278 P.2d 733]; *Estate of Agnew,* 65 Cal.App.2d 553, 565 [151 P.2d 126].)

The judgment is reversed.

Schottky, J., and Peek, J., concurred.

A petition for a rehearing was denied May 18, 1956, and respondents' petition for a hearing by the Supreme Court was denied June 7, 1956. Carter, J., Traynor, J., and McComb, J., were of the opinion that the petition should be granted.

Carter, J., then filed the following opinion:

CARTER, J.—Because of the far-reaching effect of the decision of the District Court of Appeal (*ante,* p. 944 [295 P.2d 954, 297 P.2d 633]) in this case I am constrained to comment on the refusal of this court to grant a hearing and give the case further consideration.

I think it is obvious that the decision of the District Court of Appeal was influenced by the decisions of this court in *Estate of Lingenfelter,* 38 Cal.2d 571 [241 P.2d 990], and *Estate of Welch,* 43 Cal.2d 173 [272 P.2d 512], in both of which cases Mr. Justice Schauer and I dissented. In my dissenting opinion in *Estate of Welch* (43 Cal.2d 181 [272 P.2d 512]) I pointed out that the Constitution and statutes of this state make it mandatory that questions of fact in will contests must be determined by a jury unless a jury is waived, and that there is no distinction as to what are issues of fact in will contests and any other type of case. However, the majority of this court has seen fit in the above cited cases and in the case at bar to disregard the constitutional and statutory provisions of this state and hold, in direct violation of said constitutional and statutory provisions, that the determination of the factual issues in a will contest is the function of this court and not of the trial court or jury, thus

repealing, by judicial fiat, section 19 of article VI of the Constitution of California and section 371 of the Probate Code.

There can be no question but that the majority of this court has abrogated this constitutional and statutory provision because it is opposed to a trial judge or jury determining factual issues in cases of this character. In fact, the common expression is heard, when these cases are being considered, that ''We do not want juries to be making wills for people.'' Of course, this is not the issue in any case of this character. The issues are, whether the testator is of sound and disposing mind and whether or not in executing the will, he acted freely and voluntarily or was under the undue influence of those who profited unduly by the execution of the will. These issues have been entirely ignored by the majority and the evidence bearing upon them has been disregarded. Even if it were the function of the jury in such a case to remake a will, which it is not, I believe it could make a better will than one who is insane or whose will is the product of the undue influence of an artful, designing person. Of course, the oft-repeated assertion that a jury in a will contest makes a new will for the testator is absurd, as the only effect of a verdict upsetting a will is that the law of succession will apply to the disposition of the estate, and the heirs at law of the testator will inherit his estate instead of those who may not be the true objects of his bounty. However, so long as a majority of this court continues to violate the constitutional and statutory provisions above cited it will be idle for anyone to exercise his constitutional and statutory right to contest a will even though the evidence shows conclusively that the testator was hopelessly insane at the time he executed the will or was completely overcome by the undue influence of the proponent of the will. Thus, four members of this court by their arbitrary and capricious holding as demonstrated by every case that has come before this court involving a will contest during the past 10 years or more has, in disregard of the evidence, the verdict of a jury, the holding of the trial judge and, in many cases, the unanimous decision of the District Court of Appeal, upheld the validity of the will involved. This record clearly shows a pattern from which the inevitable conclusion must be drawn that the majority of this court is opposed to the constitutional and statutory provisions above cited and intends to nullify them by refusing to uphold any judgment rendered pursuant thereto which denies pro-

bate of a will on the ground that the maker thereof was of unsound mind or that its execution was procured by the undue influence of the proponent. In the case at bar the factual situation as disclosed by the record is as follows: On May 27, 1952, Mrs. Bullock was admitted to the Sacramento County Hospital. At that time, she was between the ages of 80 and 84 years and weighed but 57 pounds. At the time of her admission, her history was "unreliable." She was listed as senile. She was suffering from cerebral arteriosclerosis and senility. She continued to be confined in the Sacramento County Hospital from the date of her admittance, May 28, 1952, until her transfer to Mercy Hospital, in Sacramento, on June 7, 1952.

It was established at the trial by the Sacramento County Hospital records, and through the testimony of witnesses, that from the period of May 27, 1952 until June 7, 1952, and actually subsequent to that time, Mrs. Bullock was at death's door.

Mrs. Bullock was seen for the first time by Dr. Frank Warne Lee, a duly licensed physician, of Sacramento, California, who had practiced there since 1927, on June 7, 1952, at Mercy Hospital. Dr. Lee was not only a well qualified physician, he had treated Mrs. Bullock as a patient since May of 1949, had known her for many, many years when she formerly had been his neighbor, but also continued to treat her as her physician from June 7, 1952, until the date of her death on June 24, 1953. He is also a doctor who specializes in treating the aged. Dr. Lee testified variously as follows: "Mrs. Bullock remained mentally incompetent from June 7, 1952, to the date of her death," "she suffered from cerebral arteriosclerosis and encephalomalacia — softening of the brain."

She suffered from the medical conditions just described when Dr. Lee first saw her as a patient in May of 1949. The doctor testified in great detail as to his findings on June 7, 1952, which included that Mrs. Bullock was then suffering from "severe malnutrition" but in the interest of saving expenses, he testified he had her transferred to St. Ann's Nursing Home in Sacramento, on June 10, 1952. He continued to see Mrs. Bullock quite often during the subsequent year, while visiting other patients he had at St. Ann's, but he kept his official visits to her, and likewise his charges, limited to three actual visits for which he charged and was paid during that time. There was no medical cure for Mrs.

Bullock's condition. Upon her admittance to Mercy Hospital, she was in "very poor" condition, was critical, and was unconscious and incoherent throughout the first night.

Contestants called as a witness, Mary Margaret Mackey, who was the proprietress of St. Ann's Nursing Home in Sacramento, which Mrs. Bullock entered on June 10, 1952. Mrs. Mackey was a registered nurse and kept the nursing home for "bedridden, critically ill patients." Mrs. Bullock was confined there from that date until the date of her death. Mrs. Mackey was at the nursing home daily for at least 8 to 16 hours per day during all of that time, administering to Mrs. Bullock, seeing her every day, and having the care of a maximum of 14 patients to cope with, with the aid of her assistants.

During all of those hundreds of times, Mrs. Bullock was seen and administered to by Mrs. Mackey, the registered nurse and proprietress of the nursing home. Mrs. Mackey testified that Mrs. Bullock was considered by her to be incompetent all of the time. She testified Mrs. Bullock's physical health improved to the point where she gained some 16 pounds by January 9, 1953, but that she was "absolutely not" mentally competent at any time during her entire stay at the nursing home. Mrs. Mackey testified, "she paid no attention to her surroundings, to the people next to her, or anything like that."

Dr. Frank Warne Lee, by way of supplement to the foregoing, was called upon to give his medical opinion on July 1, 1952, regarding the competency of Mrs. Bullock, by reason of the fact Mrs. Laura Wheat had petitioned the Sacramento Superior Court for letters of guardianship over Mrs. Bullock. At that time Dr. Lee gave as his opinion that Mrs. Bullock was incompetent. Each time the doctor saw her during the period from June 7, 1952, until she expired on June 24, 1953, her mental condition was "the same." The doctor was asked:

"Q. [By Mr. Hefner.] Doctor, in your opinion, based upon the observations which you made of Mrs. Bullock from June 7, 1952, up to and including the time she passed away, while you were her attending physician, was she mentally competent to make a will? A. I don't think so, sir."

In addition to testifying that Mrs. Bullock had suffered from softening of the brain, when Dr. Lee first saw her as a patient in 1949, he not only stated there was no medical cure for the condition, but stated such condition gets progressively

worse. She died of a cerebral hemorrhage which proved the doctor's diagnosis, on June 24, 1953.

On the issue of undue influence the record shows that on June 6, 1952, decedent allegedly executed a will at the Sacramento County Hospital which left all of her property to proponent herein, Nellie B. Smith, and her husband, John B. Smith.

The will herein offered for probate gave the entire estate to proponent and was allegedly executed on December 31, 1952, while decedent was confined as a patient in St. Ann's Nursing Home. It was that alleged will which the jury found to have been executed while the decedent was of unsound mind and while acting under the undue influence of proponent herein and her husband, John B. Smith.

A confidential relationship was proved to have existed between decedent and proponent herein, as well as proponent's husband, John B. Smith. They had been friends for over 40 years, and during the last two or three years of decedent's lifetime, proponent's husband, John B. Smith, a cobeneficiary under the alleged will, dated June 6, 1952, had handled all of decedent's business affairs. Mr. Smith knew that decedent relied upon him and had great faith and trust in his integrity and ability. For a long time they had attended Rebekah Lodge meetings, Christian Science lectures and other functions together. They were in touch with each other "all the time" and visited three to four times per week.

Proponent's husband, John B. Smith, physically pushed decedent's second cousin from the hospital room. She had been the lifelong friend and almost daily dinner companion of decedent for many years. That occurred the day of the alleged execution of the said June 6, 1952 will at the county hospital. On the very day of the execution of said alleged will, dated June 6, 1952, decedent just "kinda stared," did not recognize the said second cousin, could not talk and was not of sound and disposing mind and memory. Decedent signed the alleged will with a wavy "X."

Proponent's husband, John B. Smith, admitted that he arranged for the lawyer to go to the hospital on June 6, 1952, and even drove the lawyer to the county hospital himself. The witness Smith claimed that at that time decedent was in "quite good health"; that she was in "about the same condition" at Mercy Hospital on June 7, 1952, that he was present when the will was executed, and decedent was of sound and disposing mind at that time. Said witness, John

B. Smith, gave conflicting versions as to the manner in which the will was executed. First he stated, in great detail, the entire conversation which allegedly took place between Mrs. Bullock and her lawyer, and later he impeached himself on the very same subject.

The evidence further showed that about 30 to 40 minutes was the length of time during which the attorney was at the hospital on June 6, 1952, when it was claimed the manner of disposing of her property was discussed, the will was actually drafted, there, in the handwriting of the lawyer, presented to the witness for signature, which she signed by a wavy X, and the two witnesses, one of whom was the attorney. At that time we find John B. Smith admittedly occupying, along with his wife, proponent herein, a confidential relationship to decedent. He had even settled and compromised a personal injury claim which Mrs. Bullock had some time before her illness. Mr. Smith had done her banking for years and had a power of attorney to draw checks on her account. Proponent admitted that decedent relied upon both her and her husband for the handling of her affairs. A confidential relationship has been conclusively proven by the admission of the adverse parties.

Proponent and her husband participated in proceedings to annul an adjudication duly made by the Superior Court of the State of California, in and for the County of Sacramento, wherein decedent was found to be incompetent. They attempted to assert decedent was sent to the county hospital against her will; they continued to see decedent three to four times per week; they attempted to whisk decedent away from the St. Ann's Nursing Home by ambulance, he waited outside while the ambulance was there, but she was not removed from the St. Ann's Nursing Home because the police were summoned. In addition, proponent and her husband falsely suggested that Mrs. Bullock was being mistreated at St. Ann's Nursing Home, and claimed to have had conversations with her to the effect that Mrs. Mackey was treating her roughly, grappling with her and bruising her person. Actually, Mrs. Bullock's skin became mottled or blue, which is a condition of the skin which accompanies old age and circulatory disturbances.

In addition, the guardian and second cousin of Mrs. Bullock testified that Mr. Smith "poisoned the mind" of decedent against her.

To say that the foregoing facts do not create an issue as to the unsoundness of mind of the testatrix at the time the will in question was executed and that undue influence was exerted over her by the Smiths, is to disregard the testimony of competent, credible witnesses as well as all justifiable inferences which may be drawn therefrom, and can only be the result of arbitrary and capricious action by the majority of this court.

I would grant respondents' petition for hearing and affirm the judgment.