[Civ. No. 20939. Second Dist., Div. Two. Oct. 21, 1955.]

Estate of MARGARET TEED, Deceased. H. J. SWEET et al., Respondents, v. FRANCIS PRENATT et al., Appellants.

E. P. Mulholland and George W. Trammell for Appellants.

John F. McCarthy for Respondents.

MOORE, P. J.—Margaret Teed, aged 80 years, died testate, June 13, 1954. She left neither husband nor children. Her only heirs at law were a nephew and a niece, Francis and Mary Prenatt. She had not seen Mary in 30 years. In that time, Francis had visited her once in 1951. She knew little of them; seldom, if ever, mentioned them. By her last will,

she excluded both of them from participation in her estate, but bequeathed the bulk of her property to H. J. Sweet who had acted as her attorney for 15 years. He prepared the will, was active at its execution, and if it should prove to be valid, he will inherit practically all that his client possessed at the time of her death. Basing their action on the theory that undue influence is presumed to have arisen out of the confidential relationship of decedent and her lawyer, the niece and nephew contested the will. But a verdict having been returned against them and the court below having approved it, they bring this appeal on the ground that the instructions given and refused by the court deprived them of a fair trial.

That the presumption of undue influence arose is not disputed. Respondent admits it; the facts prove it. Respondent had acted as decedent's attorney for 15 years. She consulted him frequently. He visited her and her friends at her apartment; he had written many wills for her. She was extremely grateful for the services he had rendered to her in resisting a contest of the will of George Albert Gay, admitted to probate December 3, 1945. By such will, Mr. Gay bequeathed his ''own your own'' apartment and other assets to Mrs. Teed. Respondent, as her attorney, successfully resisted, or steered her away from a contest of that will and by his constant loyalty and success gained the undying gratitude of Mrs. Teed. She felt, and often said, that she would not have a cent of the money but for Mr. Sweet. Such relationship and the attorney's services in preparing the will and his activity in assisting her to execute it and the provision for his ''undue'' share in the estate of Mrs. Teed, required respondent to overcome by competent proof the presumption that the will was induced by his undue influence. (*Estate of Schlyen,* 105 Cal.App.2d 648, 660 [284 P.2d 211] ; *Estate of Abert,* 91 Cal.App.2d 50, 58 [204 P.2d 347] ; *Estate of Leonard,* 92 Cal.App.2d 420, 429 [207 P.2d 66].) The presumption of undue influence, in the execution of a will, must be dispelled by the proponent before he can gain a judicial determination of its validity. (*Estate of Lances,* 216 Cal. 397, 403 [14 P.2d 768].)

Instead of directing the jury that such presumption arose out of the facts proved and the admissions of respondent, the court instructed that the burden is upon the contestants to prove this undue influence by a preponderance of the

evidence; that the presumption did not arise until the jury found that all of the elements "are proved by a preponderance of the evidence"; that contestants were required "to show affirmatively some other fact or facts which gave them a peculiar or superior claim to that bounty." Such portions of the court's instructions were contrary to law. Certain other phrases found in the court's charge were subject to just criticism. Also, the court rejected certain appropriate instructions offered by contestants.

But, by and large, the court's general charge fully presented to the jury the issues to be determined by them, the rules to be observed in reaching a verdict; discussed the kinds of evidence; defined "presumption," explained the kinds of presumptions and how one is overcome; defined inference and how it is drawn; declared one issue only is submitted for the jury's consideration, to wit, "Was the Will of Mrs. Teed executed by her under the influence of H. J. Sweet?" After explaining that the presumption of undue influence arises from the confidential relations of decedent and respondent, the latter's activity in preparing, and helping to execute the will, and his unduly profiting thereby, the court charged that *such undue influence is* sufficient to uphold a verdict; it explained that such presumption may be overcome by other evidence, "and if from all the evidence you find that the evidence fails to show by a preponderance" that the *testatrix' free agency* was overcome, you will find against the contestants. If, however, you find from all the evidence that the testatrix' free agency was overcome by Mr. Sweet, you will find in favor of the contestants upon said issue.*

---

*[Verbal instructions of court.]

"The fact that a Will is unnatural is not in and of itself sufficient to prove that the Will was the product of undue influence, but the fact of unnaturalness, if that be a fact, is a factor to be considered.

"The contestants, as nephew and niece of the testatrix, are not because of such relationship alone, natural or normal objects of the testatrix' bounty, and they must show affirmatively some other fact or facts which gave them a peculiar or superior claim to that bounty. A close friend, unrelated by blood to the testatrix, may be a natural object of her bounty. Whether or not he is is a fact to be determined by you from the evidence.

"The right to dispose of one's property is assured by law and is a most valuable instance to ownership of property and does not depend upon its judicious use. Everyone has a right to make an unjust Will, an unnatural Will, or an unreasonable Will, or even a cruel Will, and you, as jurors, have no right to substitute your judgment as to what disposition the testatrix should have made of her property for her judgment. Your sole province is to determine whether or not the Will in

■ When the proponent of a will presents evidence sufficient to overcome, rebut, or meet the presumption of undue influence then the contest fails. ■ Whether the presumption has been rebutted is a question of fact for the jury's determination. (*Estate of Lances, supra; Estate of Schlyen, supra,* 661; *Estate of White,* 128 Cal.App.2d 659, 668 [276 P.2d 11].) ■ The presumption is overcome by sufficient evidence to counterbalance it. (*Estate of Eakle,* 33 Cal.App. 2d 379, 387 [91 P.2d 954]; *Estate of Erickson,* 140 Cal.App. 520, 527 [35 P.2d 628].) ■ The proof of proponent may consist of only a preponderance of probabilities. (*Estate of Schlyen, supra,* 662.)

question here was or was not the product of the free volition of Margaret Teed or the product of undue influence exercised on her by Mr. Sweet.''

[After argument by counsel.]

''Now, the issue here is very simple, Ladies and Gentlemen: You have just one issue to determine. Of course, there are side issues, factors and phases of it. Was the testatrix' will overcome so she in making these provisions for Mr. Sweet did not act of her own volition, knowing what she did, but that in fact his will was substituted for hers? And that is the definition I have given to you. You have evidence, both direct and indirect, on that subject. If the evidence shows by a preponderance that his will was substituted for hers, and her will overcome, then, of course, you must return a verdict for the contestants; if the evidence is equally balanced or preponderates to the effect that she did act of her own volition, it was her wish and desire, then, of course, your verdict must be against the contestants and that will be expressed by your verdict that it was not by undue influence.''

''As I have heretofore told you, the contestants have withdrawn all grounds of contest, except the fourth ground, to wit, that Mrs. Teed, Testatrix, executed the Will under and by reason of undue influence exerted upon her by the proponent, H. J. Sweet.

''You have, therefore, but one issue to determine in this matter and that is, was the Will in question executed by the testatrix, Mrs. Teed, under the undue influence of H. J. Sweet: The burden is upon the contestants to prove this issue by a preponderance of the evidence . . .

''If you believe from a preponderance of the evidence that a confidential relationship existed between Margaret Teed and H. J. Sweet at the time of the execution of the Will in question here, and that Mr. Sweet was active in procuring the execution of Will, and that he unduly profited by said Will, then a presumption arises that he exercised undue influence, as I have hereinbefore defined that term, over the testatrix. This presumption is indirect evidence of such undue influence and is sufficient to uphold a verdict of undue influence. This presumption, however, is not conclusive but may be overcome by other evidence. It must be considered by you together with the other evidence bearing upon the issue as to whether, in fact, the Will was the product of undue influence on the part of Mr. Sweet, and if, from all of the evidence bearing upon this issue, you find that the evidence fails to show by a preponderance thereof that the testatrix' free agency or volition was overcome, you will find against the contestants upon the issue of undue influence. If, however, you find from all of the evidence that the testatrix' free agency was overcome by Mr. Sweet, you will find in favor of the contestants upon said issue.''

Despite the erroneous language in the instructions, it does not necessarily follow that the judgment should be reversed. The Constitution (art. VI, § 4½) provides that no judgment shall be set aside in any case on the ground of misdirection of the jury ''unless after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.'' After such examination, we are convinced that no miscarriage of justice resulted from the asserted errors.

During all of her acquaintance with Mr. Sweet, Mrs. Teed's mind was sound. But she had good cause for gratitude to him. Prior to his defense of the estate of George Albert Gay under which Mrs. Teed was the chief beneficiary, he had been attorney for Gay since 1925 and so continued to his death. Gay had had trouble with a building contractor and many controversies arose in which Sweet continued to represent Gay. Finally, the latter died leaving the bulk of his estate to Mrs. Teed. His will was admitted to probate; Mrs. Teed was the executrix. Thereupon, the disappointed contractor filed suit to contest the will as assignee of one heir, alleging undue influence had been exercised by Mrs. Teed. Also, he filed a claim in the Gay estate for $50,000. Sweet filed a rejection of it. He then attempted to settle the claim. After 18 months had elapsed, Mrs. Teed became discouraged and urged Sweet to make a settlement. Ultimately, the claim was disposed of by Mrs. Teed's paying to the contractor and his attorney $2,100, whereupon she received the estate less that sum, appraised at $57,000 and an apartment valued at $3,500 he had given her prior to his demise. During all the period of the foregoing events, Mrs. Teed worried and that worry continued after the passing of Mr. Gay. By reason of Sweet's loyalty, perseverance and efficiency, Mrs. Teed felt deeply grateful and such gratitude persisted till her death. While he consented to the payment of the sums to the contractor and his attorney, Mr. Sweet did so because of his client's anxieties, to keep her out of court and to free her from the annoyance of the controversy.

During the period from the commencement of the probate of the Gay will until her last illness, Mrs. Teed often visited respondent's office for advice upon such matters as interested her; frequently called him on the telephone and had him write some 14 wills. At the beginning, his legacy was not large, but as her gratitude was augmented by the kindnesses done for her by Mr. Sweet, she finally by the will of November 1,

1953, bequeathed practically all her possessions to the person whom she thanked for having secured for her all she had.

No dispute was offered by respondent to the charge that he had prepared the will of which he was prime beneficiary. Neither did he deny that he had assisted at its execution. During 15 years he had gained a habit of rewriting decedent's will. She called finally at his office October 30, 1953, to advise him of the changes she then desired in the disposition of her property.

Respondent produced a number of intimate friends of decedent who testified freely of the oft-repeated wishes of Mrs. Teed. Betty Brogan had been her neighbor and visited with her daily during the last five years. They discussed respondent once a week in that period. Mrs. Teed told her she was very grateful to Mr. Sweet; would never have had her home or anything but for him; had never forgotten that Sweet kept after the Gay estate; she was in "bad circumstances" until she met him; she had not heard from her people; had tried to get a pension; could never forget him; she intended to leave him considerable of her estate. Mrs. Teed told Miss Brogan she would leave her apartment "to someone who was very kind to her and helped her get it." She finally told Miss Brogan of her nephew when he came to visit his aunt. The latter told Miss Brogan she had not seen him for years; they did not have much in common. The witness identified the diary of decedent. It contained a memo: "call in case of sickness H. J. Sweet," followed by his telephone numbers and address. She accompanied Mrs. Teed to respondent's office October 30, 1953. The diary had entries of many notes recording associations with her intimate friends, her visits to Mr. Sweet's office, her telephone calls to him, calls of Betty, Jean, Patty, Anna, Mrs. Thompson and of their visits and coffee together. But the conspicuous entry throughout the little book was like this: I went up to see Mr. Sweet; spent one and one half hours talking to him. Mr. Sweet called up; went up to see Mr. Sweet. (May 19, 1953, June 11, June 25.) Went up to see Mr. Sweet (June 6); went up to see Mr. Sweet (July 11); went up to see Mr. Sweet (July 20); went up to see Mr. Sweet, had a talk with him (August 15); had long talk with Mr. Sweet (Oct. 5); went up to see Mr. Sweet and had long talk with him (Oct. 24). So ran the entries for some time prior to her stroke, November 3, 1953. Similar entries were frequently made thereafter until her death. She told Miss Brogan that the work respondent had done in defending

the contest of the Gay will had saved the money for her; she always said she would leave considerable money to Sweet. Other entries in her diaries show that as far back as January 1947 she often called on Mr. Sweet. In February, March, April, May, June, four times; July, five times; August; September, four times; October; November, five times; December, five times; January 1948, ten times; February; in March, four times. During 1949 and 1950 she visited Mr. Sweet frequently and he called several times to see her when she was indisposed. In 1950 she visited his office 15 times; in 1951, 16 times; in 1952 she called at his office 16 times.

Virginia Stairs gave testimony similar to that of Miss Brogan. She had witnessed the will of December 8, 1948 with Irene Miller and of March 29, 1948, with Iva Dell Miller.

Daisy Dell Thompson also gave testimony similar to that of Miss Brogan. She lived in the same building with Mrs. Teed; shopped and dined with her often; discussed Mr. Sweet about once a month; said Mrs. Teed declared she owed everything to him; said Mrs. Teed asked her on November 1, 1953, to go with her to Sweet's office to be a witness to her will. When ill and shaking, she asked Mrs. Thompson to call Mr. Sweet.

Fern McCabe had worked for decedent three and a half years prior to her death; saw her three times a week; gave her permanents and cleaned the house, shopped and sewed for her. She testified that Mrs. Teed was happy and cheerful, but not easily imposed upon. In August, 1953, Mrs. Teed told the witness that if anything happened to her she wanted Mr. Sweet to have her apartment. In April 1954 she told Miss McCabe she was giving her apartment to Mr. Sweet. "If anything happens to me, don't you ever—you call Mr. Sweet and don't ever leave my apartment until he gets here." Decedent had told the witness of her nephew's visit to her; that he annoyed her by getting up so early, but she never mentioned her niece to the witness. The witness identified decedent's diaries for the years 1947 to 1954 inclusive.

Mary Elizabeth "Patty" Welch had known decedent 15 years. In 1954 they visited every two weeks or Patty called her practically every day. She testified in substance that Mrs. Teed had a mind of her own. No one could influence her; she kept up on all the times; had a great many friends; she knew her intimately. When she conversed with Mrs. Teed in January 1954, the latter said she wished she could be called; "I have everything fixed the way I want it and my

Will cannot be broken.'' After the Gay estate was settled, she had told Patty it was through Mr. Sweet's effort that she had got what she then had; she had always been grateful to him; she always spoke of him as a friend; had implicit confidence in him. After her nephew left, she told Patty he had been there to visit.

Mary Irene Miller testified to long periods of friendship with decedent; that she had spoken often of her obligation to respondent and how he had saved the Gay estate for her; she would never go back to Indiana; her niece there had made remarks about her keeping house for Mr. Gay; she had made her will but had not mentioned her relatives.

From such evidence it is firmly established that Mrs. Teed's sentiment of gratitude to, and of affection for, respondent grew constantly over a period of at least seven years. With her sound mind and disposing memory it is inconceivable that a jury would have been influenced by phrases in the court's instruction relative to the amount of proof that would be required either to overcome the presumption or to outweigh the evidence introduced by the proponent in rebuttal. At any rate, after examining the entire case, we are loath to conclude that any misdirection of the jury has resulted in a miscarriage of justice. On the contrary, a just verdict was returned.

Judgment affirmed.

McComb, J., and Fox, J., concurred.

A petition for a rehearing was denied November 8, 1955, and appellants' petition for a hearing by the Supreme Court was denied December 14, 1955.