[Civ. No. 17436. First Dist., Div. Two. Sept. 3, 1957.]

Estate of JOHN P. BRAYCOVICH, Deceased. LUCY BRAYCOVICH, Appellant, v. GEORGE BRAYCOVICH et al., Respondents.

Burnett, Burnett & Somers and Stewart Cureton for Appellant.

Wyckoff, Parker, Boyle & Pope, J. Frank Murphy and Eugene J. Adams for Respondents.

BRAZIL, J. pro tem.*—After admission of the will of John P. Braycovich to probate, his widow filed a contest upon these grounds: (1) unsoundness of mind, (2) fraud, (3) undue influence and (4) improper execution of the will. Upon completion of contestant's case before a jury, respondents' motion for a nonsuit was granted. The appeal is from the judgment of nonsuit.

John and Lucy Braycovich were married August 20, 1920, in Yugoslavia. George and Peter Braycovich were then orphan nephews of John, about 11 and 12 years old respectively. Both came to live with John and Lucy a few days after the marriage, all four of them coming to the United States and to Watsonville in October of the same year. They lived together as a family in the new home until the boys married, George in 1940 and Peter the following year. John and Lucy had no children of their own, and they never did formally adopt the two orphans they brought with them from the old country. The widow was a good and faithful wife, took very good care of

*Assigned by Chairman of Judicial Council.

the home for her husband and the boys and, in general, conducted herself in an exemplary manner. It is fair to say that there was mutual love, respect and assistance among the four in much the same manner one would expect to find in a congenial family of father, mother and two sons.

The will was executed January 25, 1954, at the family home, having been prepared by attorney Parker, who theretofore had been the decedent's attorney for more than 25 years, and was witnessed by him and a Mr. Hopkins, a family friend of some 18 years. Mr. Braycovich later went to the hospital in June and died there in August, 1954 at the age of 74 without returning home in the meantime. The will declares, and all agree, that the property involved was entirely community property. The appraised value thereof at the time of death was $126,000. The nephews were appointed executors. The widow, contestant, was devised a life estate in all the property with remainder over to George and Peter in equal shares. The major item of property was the home ranch worth about $55,000, which stood in the name of decedent alone. Other parcels of real property in which the estate is interested were held as tenancies in common with the two nephews.

When the Braycovichs came to Watsonville, they first acquired the home ranch and there started farming. The two boys were treated like sons of any hard working farmer couple, working on the ranch during school vacations and being fed, housed and clothed by the elder Braycovichs without there being any board and room charged or wages paid. Until they were married, the two boys never worked for anyone other than Mr. Braycovich. As they got older, they and their foster father operated as a partnership, first on a one-fifth share for each boy and three-fifths for the decedent, and then later on in equal shares for each of the three. They formed the John P. Braycovich Company to deal in agricultural products, both in raising and processing. The physical work was done by the younger men; the bookkeeping and advising by Mr. Braycovich. Each party to the partnership drew out what he needed leaving his balance in his capital account. The Snowden ranch of 14.32 acres was taken in the boys' names alone, but the purchase price thereof, while taken from the Braycovich Company, was charged to their individual capital accounts. In 1930, the mortgage on the home ranch was $30,000, which got paid off by their mutual efforts around 1940. The boys explain their acquisition of the nine and a half acre Lawson ranch in their own names, without the purchase price

of $14,000 being charged to their capital account, as more or less a setoff for their efforts in helping pay off the home ranch mortgage.

After the marriages of Peter and George, they set up their own homes in the locality, but never did lose their close connection with the senior Braycovichs. They and their wives called at the home ranch about every day. The widow says the wives were friendly and helpful; that they would help her out with home work whenever they were asked. It is clear from the record that whatever property was acquired was the result of mutual effort and understanding; there appears no evidence of anyone taking advantage of any other prior to the execution of the will. The partnership dealt with the produce of six separately held ranches, a warehouse and some house rentals, and the proceeds were credited equally among them without regard to the ownership of each parcel. The two nephews called at the home at least daily to consult with Mr. Braycovich about their business affairs. Mrs. Braycovich seldom, if ever, took part in these discussions, as she had little or no experience in business matters. The attitude of the decedent and the contestant towards the respondents is exemplified by this question and answer appearing in the record, ''Q. Now, Mrs. Braycovich, your husband loved these boys, didn't he? A. Yes, he did; we both did.''

The decedent first fell ill in 1945 when he contracted Hodgkins disease, which stayed with him, in varying degrees of severity, until he died nine years later. In November of 1952, his already poor physical condition was aggravated by diabetes for which he thereafter took insulin every day. He spent much of his time in bed after 1952, and apparently got meaner and more difficult to live with after that time. If his wife spoke while he ate, he would stop eating; if she looked at him, he would sometimes throw his plate on the floor; frequently, he spat at her and sometimes hit at her. He became incontinent, which made it so much more difficult and unpleasant for his wife to take care of him. To make matters worse, there were times when he would laugh at her and taunt her when she had to change the bed, which she had to do many times a day. He was in the hospital on January 13th for a blood transfusion, returning to his home on January 15th. Dr. Eiskamp called to see him at home on January 16, 17, 20, 21, 23 and 25, 1954, the last date being the day the will was executed. The night before that date, decedent fell out of bed twice, and according to his widow he was very ill.

Attorney Parker and witness Hopkins called at the home on January 19th while Mrs. Braycovich was there, talked to Mr. Braycovich some 20 minutes, about what, we are not informed. Both came again on the 20th or 21st, talked to the decedent about half an hour, and left telling her they would return next day at 10 in the morning. However, as decedent was very ill that night, she called Mr. Hopkins and told him not to come. They came back to the house about 2 o'clock in the afternoon of the 25th just before Dr. Eiskamp arrived. When the doctor got there, they left the room, while the doctor attended to his patient. The will, she says, was signed before the doctor got there. She testified to the following events: Before the will was signed, she was sent for by Mr. Hopkins and went into the sick room. Her husband said, "Are you Lucy Braycovich?" to which she replied "Yes, John." He then told her "I made a will and left everything what belonged to me to you, to you here; then after you go it belongs to the boys;" whereupon she said "That's all right, John; I am satisfied." Mr. Parker read the will to her, but she testified she didn't understand it. At that time, her husband also said "I made this will just to let the boys go over there to work; it isn't right will I made" and then turning to Mr. Parker said "Mr. Parker, can I make another will?" and received the reply "John, any time you want." She testified that at the time of signing the will her husband's "mental condition was very bad," but she did not elaborate on this opinion or give any reasons for it.

After the will was executed, Mr. Braycovich asked his wife for some scotch tape, which she gave to him, and he then put a little of it around the will. So fastened, the will was left on a dresser in the house for two days or so, when it was given to Peter, to be put in the safe at the warehouse. Peter got the only key to a special compartment in the safe, went to Watsonville, put the will in that drawer and returned the key to his uncle. The will was not thereafter seen by anyone until taken from the safe, about 10 days after Mr. Braycovich died, by Peter in the presence of his brother and the widow.

After the will was admitted to probate, the widow appointed Mr. Resetar and Mr. Uvodich her attorneys in fact. Mr. Resetar retained the contestant's attorney, personally paid him $500 to file the petition and pay expenses. This is the same Mr. Resetar who held the $30,000 mortgage on the home ranch in the thirties. The widow received outside of the estate $7,300 from a joint savings account, a widow's allow-

ance of $500 a month, and the house on the home ranch, set apart as a probate homestead. Her dissatisfaction with the will, as expressed in court, appears to be her belief that she could neither sell nor borrow against her life interest in the property.

Limitations of space preclude a reference to every item of testimony presented in proof of contestant's claims, but the foregoing is a fair summary of all matters pertinent to a determination of the issues presented by this appeal. Further specific reference to the testimony in discussing the law applicable to the several grounds of appeal will hereinafter be made.

■ "A nonsuit ... may be granted 'only when, disregarding conflicting evidence and giving to plaintiff's [contestant] evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of plaintiff if such a verdict were given.' " (*Estate of Lances,* 216 Cal. 397 at 400 [14 P.2d 768].)

■ It should, however, be borne in mind when reviewing a judgment of nonsuit in a matter such as the one before us that every person of sound mind over the age of 18 years may dispose of his property by will— " 'the property of the testator is his to dispose of as he wills, and he is not called upon to consult or satisfy the wishes or views of juries or courts [citations] ; and "whether in the minds of others a will is just or unjust is a matter of opinion, and to permit a jury to determine the question without that substantial evidence which the law requires would be to permit a jury to make the disposition irrespective of the desires of a testator." ' " (*Estate of Garvey,* 38 Cal.App.2d 449 at 454 [101 P.2d 551].)

■ The actual mental condition of the decedent at the time of the execution of the will is the question to be determined upon a contest based upon unsoundness of mind. ■ Evidence to show such unsoundness either before or after the execution of the will is important only insofar as it tends to show mental condition at the time the will was exe- ■ ■ To overcome the presumption of sanity, the contestant must affirmatively show that the testator was of unsound mind when he signed the will. (*Estate of Smith,* 200 Cal. 152 at 158 [252 P. 325].) ■ Of course, this proof can be by circumstantial as well as direct evidence. ■ " 'Every

mental departure from the normal will not destroy a testamentary disposition, . . . Mental derangement sufficient to invalidate a will must be insanity in one of two forms: (1) insanity of such broad character as to establish mental incompetency generally, or (2) some specific and narrower form of insanity under which the testator is the victim of some hallucination or delusion . . . ▆ Testamentary capacity cannot be destroyed by showing a few isolated acts, foibles, idiosyncracies, moral or mental irregularities or departures from the normal unless they directly bear upon and have influenced the testamentary act.' '' (*Estate of Lingenfelter*, 38 Cal.2d 571 at 581 [241 P.2d 990].) ▆ There is no evidence whatsoever of general insanity. Mrs. Braycovich says of her husband, that ''he was so sick that he just didn't get along with nobody,'' that this included George and Peter; that he had cursed and sworn at them as well as herself and others. She expressed the opinion that he was mean, acted funny, his mental condition was bad and that his conversation was sometimes intelligent and sometimes not. A Dr. Hayden, a specialist in internal medicine, after looking over the decedent's hospital charts and records, and without ever having seen him, expressed the opinion that one who had Mr. Braycovich's symptoms and who had taken acth and cortisone as he had done, might be mentally affected. His testimony was not supported by any reasons based upon the evidence and no question was proposed to him hypothetically which included any of the events occurring on the day the will was made. Incidentally, nowhere in the record of Mr. Braycovich's several stays in the hospital is there a notation of any kind which indicated any kind of mental aberration. Furthermore, on the day the will was signed, the testator, according to the contestant, knew her, his nephews, the doctor, the lawyer and witness, and called by name many distant relatives who were living in Yugoslavia. According to her, he wanted her to give various amounts up to $1,000 to several named persons in the old country, it having been explained to the testator by Mr. Parker that because of a lack of a treaty between this country and Yugoslavia certain bequests could not be made in the will. This fact alone is sufficient explanation for his indefinite remark about having made a wrong will.

▆ An inference is more than a surmise, a possibility or a conjecture; it is a reasonable deduction from the facts proved and, of course, must be logical. There is no evidence in this record, by inference or otherwise, which would at all support

a finding that the testator at the time of executing the will did not know what he was doing—that he was of unsound mind. To the contrary, the evidence shows that Mr. Braycovich had well in mind the extent of his property and the objects of his bounty.

There is no evidence at all in the record of fraud, and no serious claim is made by the appellant in her briefs that there is. No more on the subject need here be said in view of the fact that her only reference thereto in the brief is the one line ''The above and foregoing evidence is also evidence of fraud.''

██ ''In an action to set aside a will of a deceased person on the ground of undue influence, it is necessary to show that the influence was such as, in effect, to destroy the testator's free agency and substitute for his own another person's will. [Citation.] Evidence must be produced that pressure was brought to bear directly upon the testamentary act. [Citation.] ██ Mere general influence, however strong and controlling, not brought to bear upon the testamentary act, is not enough; it must be influence used directly to procure the will, and must amount to coercion destroying free agency on the part of the testator. [Citation.] ██ It is further held that mere opportunity to influence the mind of the testator, even coupled with an interest or a motive to do so, is not sufficient.'' (*Estate of Arnold,* 16 Cal.2d 573 at 577 [107 P.2d 25].)

██ The record does not support the claim of undue influence. Peter and George were not present when the will was executed. There is no showing of any activity on their part; and, considering the close personal and business relationship between them and the testator, neither of them unduly profited from the will. Because Mrs. Braycovich testified that she did not, and her husband could not, call the attorney to the ranch, appellant infers that George and Peter must of necessity have done so. While this may be a possibility, it is not a logical inference to be drawn when we consider the number of people who visited Mr. Braycovich, and the opportunities he had to ask the doctor or others to call the attorney for him. While the two nephews were in and out of the home every day, they were actively engaged in business with their uncle. The execution of a deed by Mr. Braycovich to himself and the two nephews, to correct an error, on the same day the will was made appears clearly to have no connection at all

with the execution of the will. Furthermore, the widow was asked if she was satisfied with the terms of the will, after the testator had explained it to her generally and after the attorney had read it to her, and she unequivocally stated she was satisfied with its provisions. It should be noted also that Mr. Braycovich according to his wife appeared to be a man not easily influenced for she testified as follows: "Q. In other words your husband had a mind of his own, didn't he? A. That's right. Q. He was the boss of that operation, wasn't he? A. Yes. Q. He bossed you, bossed the two boys, didn't he? A. I could put it that way, yes."

The provisions of the will are not unnatural in light of the circumstances. The widow was 57 years old in 1954, there were no children, she had no business experience, the two remaindermen were almost as close to her and her husband as sons would be, for they had been so raised and treated. The will recognized the widow's right of choice between the life estate therein created and one-half of the community property. The fact that she was not made the executrix is of no significance as appellant claims, for it is natural for a testator to appoint a bank or business friend to administer his estate in preference to inexperienced legatees. Far from being unnatural, it seems altogether reasonable that when the testator provided a life estate for his widow, with remainder over to their two foster sons, he was making sure that she would be well provided for and the property would ultimately go to the two boys, who not only helped build up the estate, but who under the circumstances would be the natural object of affection and bounty of Mrs. Braycovich as well as of her husband.

Appellant's claim of improper execution of the will is based solely on the testator's statement, "I made this will just to let the boys go over there to work; it isn't right will I made." The first half of this sentence is not understandable without some explanation, which does not appear in the record. The second portion thereof is certainly no proof at all that the will was not properly executed and certainly would not support a finding to that effect. An expression of dissatisfaction with what had been done does not mean that it was not done according to the requirements of the law. The conduct of the testator in sealing the will with scotch tape and having it properly placed in a secure place, knowing all the while (as he had been told by attorney Parker) that he could

make another will any time he wanted, negatives any inference that the will was improperly executed.

In the light of the many reported cases involving will contests and the applicable law therein often repeated, it is readily apparent that, on the evidence produced at this trial, a motion for nonsuit was properly granted. The factual situation presented in this appeal is nowhere near as favorable to the contestant as in the *Estate of Arnold, supra* (nonsuit affirmed), *Estate of Lingenfelter, supra* (judgment denying probate and an order denying judgment notwithstanding verdict—reversed), *Estate of Finkler*, 3 Cal.2d 584 [46 P.2d 149] (judgment notwithstanding verdict affirmed), and *Estate of Bullock*, 140 Cal.App.2d 944 [295 P.2d 954, 297 P.2d 633] (jury verdict finding testator of unsound mind and under undue influence reversed). Many more such examples could be given from the legion of reported cases on the subject.

The judgment is affirmed.

Dooling, Acting P. J., and Draper, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 30, 1957. Carter, J., was of the opinion that the petition should be granted.