[Civ. No. 22952. Second Dist., Div. One. Dec. 10, 1958.]

Estate of ELLA A. WOEHR, Deceased. MARGARET WOEHR LINDSEY et al., Appellants, v. IDA WOEHR BROWN, Respondent.

MacBeth & Ford for Appellants.

Bernard C. Brennan and Edward B. Olsen for Respondent.

LILLIE, J.—Contestants appeal from a judgment entered pursuant to a jury verdict in a will contest. Probate of the document was opposed on the following grounds: (1) lack of due execution, (2) unsoundness of mind, and (3) undue influence. The court directed a verdict in favor of the proponent on the first two grounds leaving the issue of undue influence for the jury's determination, on which it returned a unanimous verdict.

Appellants contend there were procedural errors in the rendition of the verdict; there was sufficient evidence to go to the jury on the issues of due execution and mental incapacity; and the trial court committed error in refusing an

instruction concerning the value of the estate; and error in the instructions on the burden of proof as to undue influence.

The decedent, Ella A. Woehr, died on September 25, 1956, at the age of 85. Two children, respondent Mrs. Brown and a son Reginald (the father of contestants), were born of her marriage to Charles Woehr who predeceased her in 1943. Two Los Angeles apartment buildings belonging to Charles' estate were distributed as follows: the first to the decedent; the second, one-half to the decedent and the remaining half to their children in equal shares. Thereafter the decedent and Reginald jointly managed the operation of these properties. Mrs. Brown, her daughter, who had married in 1941 and moved to Indio, participated in the family enterprise to the limited extent of occasional examination of the books. A law school graduate and member of the bar, she had abandoned her law practice at the time of her marriage.

In 1944, the year after her husband's death, the decedent executed a holographic will dividing her estate equally between her two children. The document also included a non-dispositive clause that her three grandchildren be provided for by the estate until each had reached the age of 21. In January of 1950, during one of respondent's monthly visits, the decedent brought out the 1944 will and advised her that she wanted to make some changes. Specifically, she told respondent that the grandchildren "were all minors when this was written, and they are growing up now and going to be on their own, so instead of just making a provision for the care of the children until they are 21, I wish to make them a definite bequest." At decedent's request, respondent there and then prepared several drafts of a new will which were discussed with the decedent, revised and rewritten until finally acceptable to her. The final draft was typewritten by the respondent in decedent's presence. It bequeathed the sum of $500 each to the three appellants, all of whom had reached the age of 21; the residue, after a bequest of personal belongings to respondent, was left, share and share alike, to respondent and Reginald "or if one be deceased to the survivor." Reginald died in 1954.

Our first discussion concerns the claimed procedural errors involving the verdict upon which judgment was entered. After all the evidence was in, the court granted respondent's motion for a directed verdict on the first two grounds of contest, lack of due execution and unsoundness of mind. A proper form of special verdict with the customary interrogatories was fur-

nished the jury on the remaining issue of undue influence. Upon the jury's return to the courtroom less than three hours later, the judge was handed the verdict and after examination returned it to the clerk, saying: "You do not need to read the first two." The clerk thereupon read the answer to the third interrogatory, such answer being in the negative. Neither counsel requested a polling of the jury, but the trial judge's own inquiry disclosed the verdict as to that issue was unanimous. One juror, the foreman, was then permanently excused from further jury service and the remaining members, still having time to serve, were instructed by the court to report to the jury assembly room the following Monday morning. Later the same day, but subsequent to the jury's departure from the courtroom, another examination of the verdict revealed that the first two interrogatories, contrary to the court's direction, had likewise been answered in the negative. The court reassembled the jury the following morning at 9:30, counsel for both parties also being present, whereupon it inquired of the foreman, in the presence of the jury, counsel for appellants objecting that the jury had been discharged, whether it was their intention to follow the court's instructions as to the first two questions and answer them affirmatively. Stating that it was, the foreman added that he "realized last night that an error had been made." Further questions by the court disclosed that it was the foreman's intention on behalf of the jury to answer the two interrogatories in the affirmative. Each juror was then polled solely as to the negative answer to the third interrogatory and all replied that that was their verdict. Pursuant to the court's instructions, the clerk then corrected the verdict as to reflect affirmative rather than negative answers. The jury was then discharged. Appellants thereafter moved for a new trial, contending that the court lacked jurisdiction to correct or amend the verdict. The motion was denied.

Appellants rely upon the provisions of section 618, Code of Civil Procedure, which provides that once the verdict is delivered and no disagreement expressed "the verdict is complete and the jury [is] discharged from the case." However, section 618 must be read with section 619 (*Sparks* v. *Berntsen,* 19 Cal.2d 308, 313 [121 P.2d 497]), which authorizes the correction by the jury of an informal or insufficient verdict under the advice of the court, or the court to again send out the jury. In *Crowe* v. *Sacks,* 44 Cal.2d 590, 596 [283 P.2d 689], an "insufficient" verdict was declared to be one

"which goes beyond the issues of the case as stated in the instructions on the law given by the court to the jury." The following examples were cited: a verdict in excess of the statutory maximum liability; the inclusion in the verdict of improper items; and a verdict larger than that warranted by the evidence. ■ Too, "(d)efects in form of the verdict may render it 'informal' or 'insufficient'" (*Crowe* v. *Sacks, supra,* 596). ■ "The trial court retains control over such proceedings with power to procure correction of informal or insufficient verdicts until the verdict is recorded and the jury finally discharged" (*Sparks* v. *Berntsen, supra,* 313). ■ Also, "(I)n the absence of a verdict entered as required by law there is no finality to the proceedings." (*Vitamin Milling Corp.* v. *Superior Court,* 1 Cal.2d 116, 120 [33 P.2d 1016].) ■ In the case at bar the record shows the jury originally returned at 2:00 p. m. with its proposed verdict. According to the clerk's minutes for that day, the jury was later "discharged" and the verdict "filed." The minutes then recite: "Later, it appearing to the court that the jury failed to answer questions one and two as directed, the clerk is directed to cancel the filing of the verdict and to summon jury and counsel into court at 9:30 a. m., May 17, 1957, for further proceedings. All jurors are notified, counsel notified. Filing stamp on verdict is cancelled."

The original verdict was manifestly "insufficient" since it went "beyond the issues of the case as stated in the instructions on the law given by the court to the jury" (*Crowe* v. *Sacks, supra,* 596), for "(t)he direction to render a verdict in favor of one party is the decision by the court upon a question of law" (*Estate of Sharon,* 179 Cal. 447, 460 [177 P. 283]). ■ "Such decisions are within the exclusive province of the court. In giving a verdict upon such an order the jurors do not exercise discretion, but act ministerially as the instrument by which the court prepares the record which will support the only judgment that can lawfully be given. They are no more at liberty to refuse obedience than is the clerk when he is directed to do the ministerial act of entering an order or judgment of the court." (*Estate of Sharon, supra,* 460.)

■ Appellants contend, however, that section 628, Code of Civil Procedure, which provides for entry of the verdict in the court's minutes upon its receipt, likewise governs and that the filing by the clerk of the first proposed verdict constituted such recordation and entry that deprived the court of jurisdiction to proceed further (*Sparks* v. *Berntsen,* 19 Cal.

2d 308, 313 [121 P.2d 497]). We do not agree. In the first place, the duties prescribed by section 628 are essentially those of the clerk (*Estate of Witt,* 198 Cal. 407, 426 [245 P. 197]), and are ministerial in nature and unless the mistake be essentially judicial, a trial court on its own motion has jurisdiction to correct mistakes in its orders (*Estate of Burnett,* 11 Cal.2d 259, 262 [79 P.2d 89] ; *Phipps* v. *Superior Court,* 32 Cal.App. 2d 371, 374 [89 P.2d 698]). Secondly, section 628 should be read with section 664 which provides for entry by the clerk of judgment on the jury's verdict within 24 hours after rendition thereof and in conformity thereto. "(A) judgment is entered when it is actually entered in the judgment book" (*Wilson* v. *Los Angeles County Employees Assn.,* 127 Cal. App.2d 285, 289 [273 P.2d 824]). ■ As further declared in *Phipps* v. *Superior Court,* 32 Cal.App.2d, at page 375: "The rendition of the verdict is ineffectual until entered as a judgment." In the Phipps case a *nunc pro tunc* order, correcting a judgment entered several months previously, was held to be "a correction of a clerical mistake in the original entry (citation)" (p. 375) and therefore permissible.

Still another consideration compels a conclusion contrary to appellants' contention. If, as they assert, respondent still had her remedy by a motion for a new trial, an anomalous situation would have arisen, since the motion would have to be directed to the jury's findings on issues as to which the trial court had already reached a determination as a matter of law and instructed the jury accordingly. Such an eventuality was foreseen by the Supreme Court in *Redo y Cia* v. *First Nat. Bank,* 200 Cal. 161, 167 [252 P. 587], in which the court observed that absent the authority of correction by the trial court of a jury's verdict, "refractory jurors would be able to compel a new trial and thus defeat the exercise by the court of a power which it clearly possesses." Of course, we do not here have any "refractory jurors," nor was there a waiver by counsel of their duty to request an immediate correction of the defect (*Kirby* v. *Adcock,* 116 Cal.App.2d 570, 571 [253 P.2d 700])—this, because of the unfortunate statement by the trial judge that the answers to the first two questions need not be read. ■ Regardless of the rule in other jurisdictions, and appellants have cited such authorities, in California verdicts containing the defects of the type involved can either be corrected by the trial court by sending the jury back or they may be cured by the appellate court without granting a

14

new trial (*Aitken* v. *White*, 93 Cal.App.2d 134, 144 [208 P.2d 788]). Such action constitutes "no infringement upon the constitutional rights of the litigants to a trial by jury." (*Aitken* v. *White, supra*, 144.) As further declared in the White case: "Merely the form of the verdict was wrong, and the trial court did not trespass upon the province of the jury in correcting that defect in form and ordering such judgment as should have been properly entered upon the verdicts" (p. 144), all of which comports with the general rule that in the last analysis the entire record must be examined to ascertain whether any miscarriage of justice has resulted (*Crowe* v. *Sacks*, 44 Cal.2d 590, 597 [283 P.2d 689]). ▮ "No definite rule has been established, each particular case being subject to the sound discretion of the court, the best principle seeming to be that an amendment (of verdict) should or should not be permitted, as it would best tend to the furtherance of justice." (53 Am.Jur., p. 759, § 1095). ▮ Even after the discharge or separation of the jury, changes in substance can be made "if the separation is not too long and it does not appear that the jurors were subjected to outside influences in the meantime." (89 C.J.S., p. 197, § 513.) It is not here claimed that any juror during the overnight separation and after discharge was subject to influence. ▮ Furthermore, the bare fact of separation, standing alone, is not sufficient ground for invalidating a verdict (*McDowd* v. *Pig'n Whistle Corp.*, 26 Cal.2d 696, 699 [160 P.2d 797]). Although mindful of the truism that the purity of trial procedure is of paramount importance (*Hammett* v. *McIntyre*, 114 Cal.App.2d 148, 158 [249 P.2d 885]), the circumstances at bar do not warrant appellate interference with the action of the trial court and the discretion exercised by it.

Appellants' second point involves the direction of a verdict on the issue of lack of due execution. Appellants contend that a prima facie case was made out by evidence that the decedent either did not or could not understand the legal effect of the "survivorship" clause giving almost her entire estate to respondent. They rely on *Bradner* v. *Vasquez*, 43 Cal.2d 147 [272 P.2d 11], in which an attorney's contract of employment, advantage having been gained, was declared invalid in the absence of evidence overcoming the presumption of undue influence (Civ. Code, § 2235). Claiming that there is no distinction between such a contract and the instant will, appellants argue that "(t)he client in each case is taken advantage of and is tricked into signing a document. The

presumption that the client did not understand or intend to give such 'advantage' to her counsel should suffice to bring the issue before the jury.'' This rather novel approach to the problem, no other supporting California authority being cited, is deemed without merit. ▉ To the contrary, in this state there is a presumption from the fact of the will's execution that the maker has read the document and knows its contents. (*Estate of Johanson,* 62 Cal.App.2d 41, 54 [144 P.2d 72].) ▉ There is the further presumption that a will has been duly executed when the instrument has been signed by the testator and the subscribing witnesses (*Estate of Braue,* 45 Cal.App.2d 502, 506 [114 P.2d 386]). ▉ Here a prima facie case of due execution was established upon the preliminary proof (*Swift* v. *Superior Court,* 39 Cal.2d 358, 365 [247 P.2d 6]) ; that having been done, the burden was with the appellants to show lack of due execution by ''positive and affirmative'' evidence (*Estate of Darilek,* 151 Cal.App. 2d 322, 325 [311 P.2d 615]). ▉ The mere assertion that the decedent did not understand the legal effect of the clause in question does not constitute ''positive and affirmative'' evidence sufficient to warrant the jury's consideration. Additionally, the language of the clause is plain, nontechnical and readily understandable, ''or if one be deceased to the survivor.'' It is not at all essential that a person comprehend a document's legal phraseology with the eye of a lawyer, but sufficient if she fully understands what is accomplished thereby. (*Estate of Hamburger,* 126 Cal.App. 455, 464 [14 P.2d 802].)

Appellants next claim that a prima facie case was made out on the issue of mental incapacity. Their argument is brief and unconvincing. The testimony of only two witnesses, the respondent and a Mrs. Thompson, was designated by appellants for incorporation in the transcript, although the record was subsequently augmented at respondent's request to include the testimony of one appellant and six other witnesses.

Mrs. Thompson testified that she lived with the decedent for six months in 1949, leaving decedent's home about July 1 of that year, that decedent was ''childlike'' on occasion and forgetful, falsely accused her and one of the appellants of stealing money and personal articles, was ''very moody,'' ''would go in her room and stay in there,'' and never left the house. She also testified that decedent was penurious, wor-

ried about the amount of electricity in use, bought secondhand clothing and was careless in the matter of personal hygiene. Further interrogation, however, revealed that decedent transacted business at the bank, attended church bazaars, and was normal on these and other occasions.

The respondent was called as an adverse party; she thought that she and her mother could communicate by telepathy and narrated the details of an incident which indicated a degree of petulance on her mother's part. Otherwise, her testimony shed no light on decedent's mental capacity.

Mrs. Lindsey, one of the appellants, stated that her grandmother in late 1949 was "aging," "losing her memory as many older people do" and "becoming less efficient and less capable and needed to depend more on others to help her along"; "she seemed to be weak and not very active," that once the decedent thought a man had entered the house and hidden in a closet, that decedent was incapable of handling her business affairs, although she admittedly had not discussed such affairs with decedent.

Four intimate acquaintances of decedent were called by respondent, all of whom testified in substance that the decedent was mentally alert during the years 1949 and 1950. She indicated an intelligent interest in her business investments, current civic affairs and was physically active for her age. Otis Carter, an optometrist, fitted glasses for the decedent in October of 1949 and found her well mentally and physically. H. H. Jones saw decedent once or twice each month during 1949 and 1950. A contractor by occupation, he stated that decedent in a businesslike manner discussed the repairs he was engaged to make at the apartment buildings. Mrs. Carter corroborated her husband's testimony, and Ruth Rice, who had known decedent since 1927, told of decedent's intelligent conversations about her family ties and business holdings.

■ "It has become the established law of this state that the power of the court to direct a verdict is absolutely the same as the power of the court to grant a nonsuit. A nonsuit or a directed verdict may be granted 'only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given.' " (*Estate of Flood,*

217 Cal. 763, 768 [21 P.2d 579].) ██ It must be borne in mind, however, when reviewing a judgment on a directed verdict in litigation of this type that every person of sound mind over the age of 18 years may dispose of his property by will and that ''he is not called upon to consult or satisfy the wishes or views of juries or courts.'' *(Estate of Nolan,* 25 Cal.App.2d 738, 740 [78 P.2d 456].) ██ The actual mental condition of the decedent at the time of the execution of the will is the question to be here determined *(Estate of Llewellyn,* 83 Cal.App.2d 534, 561 [189 P.2d 822, 191 P.2d 419]) although evidence of mental unsoundness before or afterwards assumes importance as it may tend to establish the decedent's mental condition at the time the will was executed *(Estate of Fosselman,* 48 Cal.2d 179, 185 [308 P.2d 336]). ██ Initially, ''the will itself bears mute evidence of testator's competency'' and there is a presumption that a person was of sound mind at the time of execution of his will *(Estate of Jamison,* 41 Cal.2d 1, 13 [256 P.2d 984]); also, the contestant must affirmatively show the incapacity of the testator *(Estate of Russell,* 80 Cal.App.2d 711, 719 [182 P.2d 318]). ██ ''Every mental departure from the normal will not destroy a testamentary disposition, . . . ██ Mental derangement sufficient to invalidate a will must be insanity in one of two forms: (1) insanity of such broad character as to establish mental incompetency generally, or (2) some specific and narrower form of insanity under which the testator is the victim of some hallucination or delusion. . . . ██ Testamentary capacity cannot be destroyed by showing a few isolated acts, foibles, idiosyncracies, moral or mental irregularities or departures from the normal unless they directly bear upon and have influenced the testamentary act'' *(Estate of Lingenfelter,* 38 Cal.2d 571, 581 [241 P.2d 990]).

In the case at bar there is no evidence whatever of general insanity; the few isolated departures from the normal, heretofore listed, did not bear directly upon the testamentary act here under attack. Appellants argue, however, that there was substantial evidence as a matter of law to establish the fact that decedent lacked ability to understand the nature of the testamentary act including ''the trick clause'' which was never explained to ''her.'' The plainly understandable language of the clause in question has already been quoted, and there is no evidence in the record, by inference or otherwise, that would support any such claim as to this ground of

18

contest. ■ "An inference is more than a surmise, a possibility or a conjecture; it is a reasonable deduction from the facts proved and, of course, must be logical." (*Estate of Braycovich,* 153 Cal.App.2d 505, 512 [314 P.2d 767].)

■ Appellants further contend that the evidence as a matter of law established decedent's inability to recollect or understand the nature and situation of her property and to remember the persons having claims on her bounty. The merit of any such assertion is dispelled by the testimony of Mrs. Thompson, appellants' witness, who under questioning conceded that the decedent knew of her relationship to her grandchildren, that Reginald and the proponent were her children, that she knew of the existence of certain (if not all) of her property and that the proponent and Reginald were managing the same. Appellant Mrs. Lindsey testified substantially to the same facts. ■ In *Leonard* v. *Watsonville Community Hospital,* 47 Cal.2d 509, 515 [305 P.2d 36], the Supreme Court stated another rule applicable to directed verdicts: "It is settled that where the evidence raises an inference that a fact exists, and either party produces evidence of the nonexistence of the fact that is clear, positive, uncontradicted and of such a nature that it cannot rationally be disbelieved, the nonexistence of the fact is established as a matter of law." In the light of the many reported cases involving will contests and the law applicable thereto, it is apparent that the motion for directed verdict as to the instant ground of contest was properly granted. The factual situation here is much weaker than that held insufficient to justify the setting aside of wills for reasons of mental incompetency in other cases decided by our reviewing courts. (See partial list cited in *Estate of Llewellyn,* 83 Cal.App.2d 534, 555 [189 P.2d 822, 191 P.2d 419].) Later decisions to the same effect include *Estate of Gilbert,* 148 Cal.App.2d 761 [307 P.2d 395]; *Estate of Gagliasso,* 150 Cal.App.2d 65 [309 P.2d 513]; *Camperi* v. *Chiechi,* 134 Cal.App.2d 485 [286 P.2d 399]; *Estate of Dunne,* 130 Cal.App.2d 216 [278 P.2d 733]; *Estate of White,* 128 Cal. App.2d 659 [276 P.2d 11]. The facts in *Estate of Fosselman,* 48 Cal.2d 179 [308 P.2d 336], are completely dissimilar and make that case inapplicable.

■ Appellants' next point involves the refusal of the court to read their instruction Number 10, particularly as it pertained to the value of the decedent's estate. The instruction provided: "Although an unjust will does not of itself raise an inference of undue influence, the nature of the alleged

will may be considered by the jury as a circumstance, together with evidence of the value of the estate, and the manner in which the will was made." In *Estate of Snowball*, 157 Cal. 301, 314 [107 P. 598], the court declared that the value of an estate is a factor for consideration on the issue of undue influence and the instruction here proffered might well have been given if competent evidence had been forthcoming relative thereto. The trial court herein refused to require respondent to answer a question as to the assets owned by decedent in 1950, observing that the parties were "not trying any assets here." As the person who regularly examined the books of decedent's rental properties, respondent might have been competent to testify as to certain cash assets and the amount of the various rentals; but as to her competency to testify as to the value of the estate itself we express no opinion. No offer was made by appellants to furnish such competent evidence. Bearing in mind the recognized principle that there can be no reversal absent an affirmative showing that the claimed error was likely to mislead the jury, we conclude that no prejudice resulted from the action of the trial court here complained of.

Appellants' final contention relates to the court's refusal to give certain instructions on the burden of proof as to undue influence. In this connection we observe that on the court's own motion the entire charge was given in the court's own language and it appears to include the specific instructions approved by and large in *Estate of Teed,* 136 Cal.App.2d 401, 403-404 [288 P.2d 921].

Appellants' instructions numbered 2 and 3 would have told the jury that the respondent "was acting as attorney and lawyer for her mother, Mrs. Ella A. Woehr, at the time that she drafted the alleged will of January 18, 1950, and supervised its alleged execution" (No. 2) and that respondent "prepared and typed the alleged will . . ." (No. 3). Each point was covered by the court's instruction which declared that a confidential relationship existed between Mrs. Brown and Mrs. Woehr, and that Mrs. Brown was active in procuring the execution of the will. A party is not entitled to have the jury instructed in any particular language as long as the court correctly announces the substance of the law applicable to the case (*Hooper* v. *Bronson,* 123 Cal.App.2d 243, 254-255 [266 P.2d 590]). A lawyer-client relationship is per se a confidential one and it matters little whether Mrs.

Brown "drafted" or "supervised" or "typed" or "prepared" the will because "procured" means the same thing.
 Next, appellants claim error in the refusal of the court to read their Instruction Number 4: "One who unduly profits by a will, such as by being made the beneficiary of the bulk of the estate, has the burden of proving that she did not use undue influence on the testatrix, if the said beneficiary was in a confidential relation with the testatrix (as is here established) and if she participated in preparation of the will as Mrs. Brown has here admitted." The substance of this instruction is found in another part of the court's charge which told the jury that if a confidential relationship exists, together with activity in its procurement and undue profiting, a presumption of undue influence arises which, unless overcome, is sufficient to uphold a finding for the contestants. Here again the applicable law was correctly given and appellants may not complain that their refused instruction is couched in stronger or perhaps more colorful language.

 Instruction Number 5, which the court also refused to read, was repetitious of instructions given by the court on the presumption of undue influence which arises upon the concurrent existence of the factors of confidential relationship, activity and undue profiting, and the sufficiency of "evidence to counterbalance it" (*Estate of Teed,* 136 Cal.App.2d 401, 405 [288 P.2d 921]). Because of such repetition, the instruction proposed was properly refused (*Estate of Volen,* 121 Cal. App.2d 161, 166 [262 P.2d 658]). Instruction Number 6 was based on a verbatim instruction given in *Estate of Pellegrini,* 138 Cal.App.2d 143, 149 [291 P.2d 558] (footnote). Once again, other instructions given by the trial court correctly explained the general meaning of the term "undue influence" and the exception thereto which occurs when there is a confidential relationship coupled with activity and undue profiting.

 Appellants complain of the use of the qualifying clauses "if you find" or "if it arises" in its explanation of the law governing undue influence. They did not invade the province of the jury, since it had the duty to decide whether or not there was undue profiting by the respondent, failing which a presumption of undue influence would not arise.

 There is also the complaint by appellants that undue emphasis was placed by the court on the existence of but one issue for the jury's determination; namely, the presence or absence of undue influence. In view of the fact that the

grounds of lack of due execution and mental incapacity had been withdrawn from the jury's consideration, it was not improper for the court to make that fact known.

██ In their reply brief, and at some length, appellants claim prejudicial error in the court's refusal or failure to explain the legal meaning of "sound mind," asserting that "the issue of undue influence necessarily includes the issue of soundness of mind." Each is a distinct ground of contest (Prob. Code, § 371) and they are related only to the extent that the trier of fact may consider the decedent's state of mind as bearing upon his or her ability to resist importunity. (*Estate of Stoddart*, 174 Cal. 606, 612 [163 P. 1010].) ██ Here the jury was instructed that it had the right to consider the physical and mental condition of Mrs. Woehr in connection with the claim of undue influence (*Estate of Teel*, 25 Cal.2d 520, 527 [154 P.2d 384]), and no reversible error is manifest from the failure to elaborate any further on the point in question, nor were appellants prejudiced by the court's omission to read their proposed instructions on the asserted fraud and misrepresentation perpetrated by the proponent and which, they state, constituted part of the proof of undue influence.

We have carefully examined the instructions in their entirety and they contain a full and fair explanation of the applicable law for the guidance of the jury. No complaint is made that there is any lack of substantial evidence to support the jury's unanimous finding that the document offered for probate was the decedent's free and voluntary act. ██ Examining the instructions as a whole, which the law requires, it is clear that the jury was not misled (*Gordon* v. *Aztec Brewing Co.*, 33 Cal.2d 514, 519 [203 P.2d 522]).

For the foregoing reasons the judgment is affirmed.

White, P. J., and Fourt, J., concurred.